**David R. RUIZ, et al.,**
**Plaintiffs-Appellees,**

**United States of America,**
**Intervenor-Appellee,**

**v.**

**W. J. ESTELLE, Jr., et al.,**
**Defendants-Appellants.**

**No. 81–2224.**

United States Court of Appeals,
Fifth Circuit.
Unit A

June 26, 1981.

Ed Idar, Jr., Sp. Asst. Atty. Gen., Austin, Tex., for defendants-appellants.

William Bennett Turner, San Francisco, Cal., for Ruiz, et al.

Jim D. Wiginton, Angleton, Tex., for L. D. Hillard.

Dennis J. Dimsey, Atty., Sp. Lit. Sect., Civil Rights Div., Dept. of Justice, Washington, D.C., for plaintiffs-appellees.

Before CHARLES CLARK, REAVLEY and WILLIAMS, Circuit Judges.

PER CURIAM:

The State of Texas seeks to stay portions of an injunction that imposes sweeping and exacting changes upon the State's prison system and its operation.

An overview of the injunctive relief that was granted by the district court in this case is contained in its memorandum opinion. *See Ruiz v. Estelle,* 503 F.Supp. 1265, 1385–1390 (S.D.Tex.1980). Essentially, the district court's injunction, entered on April 20 and amended on May 1, 1981, obligates the Texas Department of Corrections (TDC) to, *inter alia,* reduce the inmate population in each prison unit to alleviate overcrowding, increase the security guard and support staff, furnish adequate medical and psycho-

logical care, and bring all living and working environments into compliance with state health and safety standards. The district court's order is not a preliminary injunction; it decrees a reorganization of the State's entire prison system. Construction of future prison units and modification of present units are required by the court's order. Moreover, the provisions of the district court's order regarding staffing and internal operations must be effected immediately or steps taken immediately toward the district court's various deadlines.

It is not the assignment of this Court at this time to decide either the advisability or even the constitutionality of the changes which the district court has decreed. It will never be the responsibility of this or any other federal court to decide what a good prison should be or how it ought to be operated. That is for the corrections experts and the policy making officers of the states. The federal courts may interfere only to protect prisoners against cruel and unusual treatment, because that is prohibited by the Eighth and Fourteenth Amendments of the United States Constitution. Furthermore, the present appeal has not reached a disposition on the merits, which will require a decision upon the question of what the Constitution does require in the present case. The record is not before us; arguments of the parties have not been presented. What is before us now is only the motion of the State for emergency relief during the weeks or months ahead while the appeal is being completed and decided.

## I.

The portions of the district court's order which the State of Texas seeks to stay are as follows:

### A. Overcrowding

### 1. Maximum Population: 11–1–82.

With respect to the maximum prisoner population, the district court's order requires that by November 1, 1982, TDC must reduce its overall inmate population to a figure equal to 1.5 times the number of general population cells, plus the number of inmates who can be housed in dormitories that afford 60 square feet (excluding bathing, toilet and activity areas) per prisoner. TDC may not thereafter, until further order of the court, accept any prisoner whose confinement would cause the inmate population to exceed that figure.

### 2. Maximum Population: 11–1–83.

By November 1, 1983, TDC must reduce its overall inmate population to a number equal the number of general population cells, plus the number of inmates who can be housed in dormitories that afford 60 square feet (excluding bathing, toilet and activity areas) per prisoner. TDC is precluded from accepting any inmate after that date whose confinement would cause the general population to exceed that figure.

### 3. Triple-celling.

After August 1, 1981, TDC may not confine any inmate with more than one other prisoner in any cell. Until triple-celling has been eliminated, no inmate may be confined in any cell with more than one other inmate for more than 10 days during any 30 day period. The State seeks to stay only this last part of the order dealing with prisoner rotation.

### 4. Double-celling.

By August 1, 1982, no more than 50% of the inmate population housed in cells may be assigned to cells of 60 square feet or less holding two prisoners. By August 1, 1983, no inmate may be assigned with another prisoner to a cell containing 60 square feet or less.[1]

### 5. Dormitory Space.

With respect to inmates housed in dormitories, by November 1, 1981, TDC may not

---

1. In effect, even though the district court's injunction authorizes double-celling of inmates in cells of 60 square feet or more after August 1, 1983, part I.B.(4) of the district court's order requires the single-celling of inmates at TDC after November 1, 1983.

confine any inmate to a dormitory providing less than 40 square feet per prisoner. By November 1, 1982, TDC may not confine any inmate to a dormitory providing less than 60 square feet per prisoner. (The permissible square footage in dormitories excludes areas used for bathing, toilet or recreation activities, generally known as the "day room.")

### 6. *Work Furlough.*

As a measure to alleviate the overcrowding in the various facilities, TDC is required to make maximum use of its authority under Tex.Rev.Civ.Stat.Ann. art. 6166x-3 (Vernon Supp.1980–81) to house inmates outside of TDC units on the work furlough program authorized by the statute. Specifically, the court's order requires that by November 1, 1981, TDC shall have at least 300 inmates on work furlough; by May 1, 1982, TDC must have at least 1,200 inmates on work furlough; and by November 1, 1982, and thereafter until further ordered by the district court, TDC must have at all times at least 2,500 inmates on work furlough.

### 7. *Temporary Furlough.*

TDC must expand its temporary inmate furlough program as authorized by Tex. Rev.Civ.Stat.Ann. art. 6184n, § 2 (Vernon Supp.1980–81). Specifically, by November 1, 1981, TDC must have at least 300 inmates on this furlough program; by May 1, 1982, TDC must have at least 600 inmates on furlough; and by November 1, 1982, and thereafter until further order of the district court, TDC must have at all times at least 1,000 inmates on this furlough program.

### 8. *Review of Good Time Credits.*

By November 1, 1981, TDC must review the record of every inmate not having credit for State Approved Trusty III good time for the entire period he has been confined in TDC and then consider whether the inmate should have been credited with additional good time.

### 9. *Expanding Community Corrections.*

TDC must expand its role in community corrections and establish minimum security institutions, honor farms, halfway houses, urban work or educational release centers, community treatment centers, and the like. These facilities must be located in areas near population centers of sufficient size to provide services. By November 1, 1981, TDC must furnish the court with a plan for the establishment of such facilities with or without the participation of other state or local agencies.

### B. *New Facilities*

### 1. *Construction of New Units.*

The injunction requires that TDC not make a final selection of a site, nor undertake the construction of any new units, for housing of inmates unless it has filed a report with the court demonstrating that the following conditions are met:

(a) The population of a TDC unit may not exceed 500 inmates, or the unit must be so structured that the population of each organizational sub-unit within the unit may not exceed 500 inmates.

(b) A new TDC unit may not be located more than 50 miles from a Standard Metropolitan Statistical Area (SMSA) with a population exceeding 200,000 persons, unless TDC submits a report showing that it is able to recruit and maintain adequate numbers of qualified professionals, paraprofessionals, and others in all disciplines necessary to the effective functioning of a correctional unit in a constitutional manner.

(c) All inmates classified as maximum security prisoners must be confined to *single cells* of at least 60 square feet.

(d) All inmates classified as minimum security prisoners must be confined to *single cells* of at least 60 square feet or in dormitories providing at least 60 square feet per inmate, excluding bathing, toilet, and recreation ("day room") areas.

### 2. Beto and Grimes County Units.

By August 1, 1981, TDC must file a report with the court providing the information required above for the Beto Unit (now under construction) and the proposed Grimes County Unit.

### 3. New Facilities at Existing Units.

TDC is prohibited from undertaking construction of any new facilities or cell blocks for the housing of inmates at existing correctional units unless it has filed a report demonstrating that these conditions are met:

(a) All inmates classified as maximum security prisoners must be confined to *single cells* of at least 60 square feet.

(b) All inmates classified as minimum security prisoners may only be confined to *single cells* of at least 60 square feet or in dormitories providing at least 60 square feet per prisoner, excluding bathing, toilet, and recreation ("day room") areas.

(c) TDC is able to recruit and maintain adequate numbers of qualified professionals, paraprofessionals, and others in all disciplines necessary to the effective functioning of the entire unit in a constitutional manner.

### C. Reorganization of TDC

The injunction requires that TDC submit to the court a plan providing for the reorganization and decentralization of the management of each TDC unit housing more than 500 inmates. Said plan must assure that TDC units are subdivided into subunits of no more than 500 inmates, that the warden of any unit will be responsible for no more than 500 inmates, that each organizational component of a unit is administratively and programatically decentralized with its own manageable supervisory structure, and that architectural modifications and retrofitting necessary to create the subunits and their reorganization will be completed before November 1, 1982. This plan must be submitted by November 1, 1981.

### D. Security and Staffing

### 1. Inmate-Guard Ratios.

With respect to maintaining a secure and safe environment for the inmate population, the injunction requires that TDC employ sufficient trained security staff, taking account of the security levels of the prison population and the design of TDC facilities, to provide for the security, control, custody and supervision of the inmates. Specifically, by November 1, 1981, TDC is required to have hired and trained sufficient security staff so that the staff-inmate ratio exceeds one uniformed correctional officer for every 10 inmates. By May 1, 1982, TDC must have hired and trained sufficient security staff so that the staff-inmate ratio exceeds one uniformed correctional officer for every eight inmates. By November 1, 1982, the TDC staff-inmate ratio must exceed one uniformed correctional officer for every six inmates, and this ratio must be maintained thereafter.

### 2. Staffing Patterns.

By November 1, 1982, TDC must maintain the following minimal security staffing pattern:

"(a) at least one officer shall be assigned to each tier of every cell block at all times when any cell in the tier contains more than one prisoner.

"(b) at least one officer shall be assigned to remain in each dormitory at all times when more than two but less than 40 prisoners are situated therein.

"(c) at least two officers shall be assigned to remain in each dormitory at all times when more than 40 prisoners are situated therein.

"(d) for each dormitory in which an officer is posted, an officer situated at some outside point shall have some form of contact (e. g., voice communication, beeper, visual observation) with the officer on the inside, in order that additional staff may respond rapidly to any difficulties which may occur inside the dormitory."

### 3. Alternative Staffing Patterns.

The district court's order provides for the appointment of a special master to monitor compliance by TDC with the injunction. If TDC believes that the minimal staffing pattern described in the court's order is unnecessary to the protection of inmates as to a specific cell block or dormitory, TDC may file a report with the special master delineating its contentions as to why the particular prescribed staffing pattern in the court's order is unnecessary in the particular instance. If the special master, after allowing time for objections from the plaintiffs, agrees with TDC in a particular instance, relief from the court's order regarding staffing patterns (part II.A.(2) of the district court's injunction) may be effected, provided TDC complies with any alternative staffing pattern that may be prescribed by the special master. An appeal from a decision of the special master lies to the district court.

### E. Building Tender System

#### 1. Inmate Jobs.

The injunction requires that no inmate or group of inmates may have administrative or supervisory authority over other inmates or be placed in positions to administer disciplinary action. TDC is required to eliminate immediately the building tender system.[2] Specifically, TDC must abolish the jobs of "building tenders," "hall tenders," "orderlies," "floor boys," "turnkeys," "key girls," "porters," "bookkeepers," "count boys," "field porters," "water boys," "lead row workers" and "tail row workers." No inmate may be placed in a position to exercise administrative or supervisory authority over another inmate, to assist in counting other inmates, to possess keys or weapons, to escort inmates to different areas of a unit, to provide access to areas of a unit, to influence cell assignments of other inmates, or to have access to another inmate's medical or institutional records. The State does not challenge that part of the court's order which prohibits the placing of inmates in a position to exercise administrative or super-

visory authority over other inmates. However, the State wishes to stay the other portions of the court's order regarding the aforementioned inmate job assignments.

#### 2. Job Assignment Rotation.

The injunction requires that if inmates are assigned acceptable duties heretofore performed by building tenders (including distribution of correspondence, commissary script or goods, operation of television sets and other day room games or activities, keeping track of the whereabouts of other inmates, and performing janitorial services), such duties must be rotated at least every 30 days so that inmates in a particular housing unit have the opportunity to share these duties (along with the accompanying benefits of open cells, flexible meal hours and the like). The duties relating to each such inmate job assignment must be written and posted in a conspicuous manner in the area where the duties are to be performed, and a roster of inmates assigned these duties and the term of service must be maintained at each unit. The State objects to the portion of the court's order requiring rotation of these inmate jobs every 30 days and seeks a stay thereof.

### F. Classification of Inmates

With respect to classification of inmates, the injunction requires that so long as TDC confines more than one inmate to a cell of 60 square feet or less, or to a dormitory, TDC must maintain a classification system assuring that abuses of inmates by those with whom they live will be minimized. By August 1, 1981, TDC must file a plan with the court setting forth an adequate classification system and timetable for its implementation. This plan must include provisions that ensure in the future only minimum security inmates will be assigned to live in dormitories.

### G. Medical Care

The injunction requires the Huntsville Unit Hospital to be downgraded for use as the unit infirmary by November 1, 1981,

---

**2.** A description of the building tender system is contained in the district court's memorandum

opinion. See *Ruiz v. Estelle*, 503 F.Supp. at 1294–98.

and it may not be used for care of inmates from other units, unless it can be brought into compliance with the standards of the Texas Hospital Association or the Joint Commission on Accreditation of Hospitals by November 1, 1981. Otherwise, TDC must provide for adequate hospital facilities, staffed, equipped and operated in accordance with Texas Hospital Association or Joint Commission on Accreditation of Hospitals standards, for the care of the TDC population, and must make a report to the district court by August 1, 1981, of its plans for doing so.

### H. Administrative Segregation & Disciplinary Hearings

#### 1. Administrative Segregation.

The injunction requires that TDC may not confine inmates to administrative segregation pending a disciplinary hearing without (1) ascertaining whether administrative segregation is in fact necessary to safeguard institutional security, (2) detailing in writing the reasons for the administrative segregation, and (3) ensuring that inmates are provided the means, through counsel substitute or otherwise, to gather evidence and prepare their defense in anticipation of the disciplinary hearing. An inmate segregated pending a disciplinary hearing must, whenever possible, be given a hearing within three days and, if the inmate is not given a hearing within three days, the reasons therefor must be set forth in the record of the hearing. In any event an inmate segregated pending a disciplinary hearing must be given the hearing within 10 days, and credit for time served in prehearing detention must be considered by the disciplinary committee assessing a penalty in the event the inmate is determined guilty of the charged infraction.

#### 2. Record of Hearings.

All disciplinary hearings must be recorded by tape recorder or other means of preserving a verbatim record of the proceedings, and this record must be preserved for at least one year after the hearing. An inmate or his counsel substitute must be allowed access to the tape recording in connection with any litigation in which the disciplinary hearing may be relevant.

#### 3. Exercise and Recreation.

An inmate may not be confined to administrative segregation without the opportunity for regular outdoor exercise if the prisoner is confined for longer than three days. Further, segregated inmates must be allowed to leave their cells at least once a day for physical recreation of at least an hour's duration, unless in individual cases fulfillment of this requirement would create an immediate and serious threat to prison security. By November 1, 1981, TDC must file with the court a plan providing for increased and regular out-of-cell recreation opportunities for inmates segregated on Death Row.

#### 4. Double-celling.

No inmate may be confined to administrative segregation with another prisoner in a cell containing 60 square feet or less after August 1, 1981.

### I. Inmates' Access to Courts and Legal Counsel

#### 1. Visitation and Mail.

The injunction mandates that TDC may not interfere with the right of inmates to have access to attorneys and their authorized representatives, including paralegals, law students, investigators, or other assistants to counsel. The order sets forth the detailed requirements and procedures for attorney-inmate visitation and conferences. In addition, specific requirements and procedures are set forth for handling of mail addressed by any inmate to an attorney or mail addressed from an attorney or public official to any inmate.

#### 2. Notary Services.

TDC is mandated to provide inmates with reasonable access to notary public services, and notaries may not be permitted to approve, disapprove or to read an inmate's legal materials beyond that review necessary for the identification of the document.

Inmates may not be required to surrender their documents as a condition for obtaining notarization.

### 3. Law Library and Legal Materials.

The injunction requires that inmates must have access to and use of an adequate law library. In addition, TDC must permit inmates to retain a reasonable amount of legal papers, legal correspondence, law books, legal notes, and other legal materials in their cells or dormitories or, at an inmate's election, in the unit law library (writ room) or in some other secure place provided by TDC. These legal materials may not be considered "contraband," and inmates may not be punished for possessing such materials. Inmates in segregated status (administrative, disciplinary or medical) must also be provided with reasonable access to legal materials and services and be provided with an opportunity to communicate with counsel by mail or in person.

### 4. Assistance by Other Inmates.

TDC must permit inmates to assist other inmates with the preparation of legal matters, subject to reasonable regulation of time, place, and manner of such assistance.

### J. Health and Safety

### 1. Fire Safety.

TDC must forthwith develop specific fire safety regulations and evacuation plans, construct adequate fire exits to ensure the safety of inmates, and otherwise comply with the current edition of Life Safety Code of the National Fire Protection Association.[3] By November 1, 1981, TDC must file a report with the court stating the measures taken or planned, together with timetables for completion, which will assure compliance with the applicable provisions of the Life Safety Code. Every unit is required to be in compliance with these fire safety standards by May 1, 1982, and no inmate may be confined in any unit, or assigned to work in any area that is not in compliance with those standards after this date.

### 2. Health and Safety Statutes.

The injunction requires that TDC comply with the requirements of various state health and safety statutes. These statutes regulate the following: canneries, meat processing plants, dairies, dining halls and food preparation areas; food service and processing employees; meat and poultry operations; egg-handling operations; milk production; mill, workshop, factory, laundry and other industrial operations; and industrial and agricultural operations. By November 1, 1981, TDC must file with the court a plan for regular and adequate inspections of all its facilities by independent and qualified inspectors to ensure TDC's compliance with said state health and safety statutes.

### K. Special Master

The injunction provides for the appointment of a special master and the filing of all reports and plans required by the court's decree, and the consent decree agreed to by the parties, with the special master by the dates specified. Specifically, TDC must promptly provide the special master with copies of disciplinary records required pursuant to section IV.A.(5) of the court's order, together with any appeals taken by inmates from disciplinary decisions and, upon the special master's request, tapes or other verbatim records of the disciplinary hearings. TDC must promptly provide the special master with reports of physical examinations of inmates entering solitary confinement and reports of their physical and mental health while so confined in order to establish compliance with existing TDC rules. TDC must promptly provide the special master with copies of reports on uses of force and chemical agents.

### II.

As is said at the outset, we have before us now only a motion to stay portions of the

---

**3.** The district court's injunction also requires that TDC comply with the current edition of the Life Safety Code of the National Fire Protection Association in the construction of any new facilities or new prison units.

district court's injunction under Fed.R. App.P. 8. Therefore, we do not decide the merits of the State's appeal from the lower court's injunction; instead, we consider only whether the district court's injunction should be stayed pending complete review.

Under Rule 8 and precedent, we must consider four factors to determine whether the State has made a sufficient showing for this court to grant a stay of the injunction pending appeal. These factors are (1) whether the movant has made a showing of likelihood of success on the merits, (2) whether the movant has made a showing of irreparable injury if the stay is not granted, (3) whether the granting of the stay would substantially harm the other parties, and (4) whether the granting of the stay would serve the public interest. *See Coastal States Gas Corporation v. Department of Energy*, 609 F.2d 736, 737 (5th Cir. 1979); *Fortune v. Molpus*, 431 F.2d 799, 804 (5th Cir. 1970); *Belcher v. Birmingham Trust National Bank*, 395 F.2d 685 (5th Cir. 1968).

With respect to the first requirement for a stay pending appeal, it is a widely held view that a stay can never be granted unless the movant has shown that success on appeal is probable. "Adherents to this view maintain that a lesser showing, of, say, a chance of prevailing that is only fifty percent or less is insufficient even though the 'balance of equities,' as determined by a consideration of the other three factors, clearly favors a stay." *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977). In *Holiday Tours*, the District of Columbia Circuit declined to follow this view. The court held:

"[A] court, when confronted with a case in which the other three factors strongly favor interim relief, may exercise its discretion to grant a stay if the movant has made a substantial case on the merits. The court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, as in this case, may grant a stay even though its own approach may be contrary to movant's view of the merits. The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors."

559 F.2d at 843.

The court emphasized a balance of equities approach in determining whether to grant a stay pending appeal. Generally, the court emphasized that the grant of a stay pending appeal is preventive or protective in that it seeks to maintain the status quo pending a final determination on the merits of the suit. In this regard, the court noted:

"An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant. There is substantial equity, and need for judicial protection, whether or not movant has shown a mathematical probability of success."

*Holiday Tours*, 559 F.2d at 844.

We find the District of Columbia Circuit's reasoning in *Holiday Tours* persuasive and hold that on motions for stay pending appeal the movant need not always show a "probability" of success on the merits; instead, the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay. *Providence Journal v. Federal Bureau of Investigation*, 595 F.2d 889 (1st Cir. 1979); *see Houston Insulation Contractors Ass'n v. N.L.R.B.*, 339 F.2d 868, 870 (5th Cir. 1964). If a movant were required in every case to establish that the appeal would probably be successful, the Rule would not require—as it does—a prior presentation to the district judge whose order is being appealed. That judge has already decided the merits of the legal issue. The stay procedure of Fed.R. Civ.P. 62(c) and Fed.R.App.P. 8(a) affords interim relief where relative harm and the uncertainty of final disposition justify it. Of course, if the balance of equities (*i. e.* consideration of the other three factors) is

not heavily tilted in the movant's favor, the movant must then make a more substantial showing of likelihood of success on the merits in order to obtain a stay pending appeal. It is with these considerations in mind that we address appellants' motion for stay pending appeal.

### III.

Before we proceed to the disposition of the State's motion, we must consider the plaintiffs' argument that the State has not complied with Fed.R.App.P. 8(a). Rule 8(a) provides that an "[a]pplication for a stay of the judgment or order of a district court pending appeal . . . or for an order suspending, modifying, restoring or granting an injunction during the pendency of an appeal must ordinarily be made in the first instance in the district court." The Rule further provides that a motion for stay may be made to the court of appeals, "but the motion shall show that application to the district court for the relief sought is not practicable, or that the district court has denied an application, or has failed to afford the relief which the applicant requested, with the reasons given by the district court for its action."

Plaintiffs argue that the State has attempted to circumvent Rule 8(a) by filing in the district court a one-paragraph motion to stay the injunction pending appeal two full months before the district court actually entered its decree.[4] Plaintiffs assert that the State has now filed in this court reams of affidavits and other evidentiary materials never presented to or considered by the district court. The plaintiffs contend that permitting this tactic would undermine the very purpose of Rule 8(a).

In a hearing on April 20, 1981, the district court acknowledged that a motion for stay pending appeal had been filed. Judge Justice noted that it was somewhat anomalous that such a motion would be filed prior to the court's actual entry of the decree, but that he would consider the motion for stay to be properly before the court. The district court entered a lengthy order denying the State's motion for a stay on this date.

In its order denying the State's motion for stay, the district court indicated that the State would appear to have but little chance of prevailing on appeal with reference to the findings of unconstitutional conditions in the Texas prison system. Moreover, the court noted that many of the remedial measures required in its injunction call for long-range relief which need not be implemented immediately. Judge Justice also noted that the State was not caught unawares by the injunctive order since his memorandum opinion, which recited in detail the constitutional deficiencies within TDC and projected an outline of the relief to be ordered, was issued four months previously. Therefore, Judge Justice concluded that the State had ample advance warning to begin its planning and to undertake steps to meet the general thrust of his injunction. Although concluding that the class of inmate plaintiffs would clearly continue to suffer irreparable harm if a stay pending appeal were granted, Judge Justice did not in his order state that he considered the effects of the consent decree previously entered into between the parties which would lead to the alleviation of many of the unconstitutional prison conditions at TDC.

In the order denying the motion for a stay pending appeal, Judge Justice indi-

4. The State's motion for a stay pending appeal reads as follows:

"Come defendants and move, should the court grant relief on the issues as to which defendants will seek appeal or which is substantially different from the proposals herein made by defendants or relief that is substantially different from that agreed to by the parties in the consent decree referred to, and should the relief granted create an onerous burden and intrude unreasonably upon day-to-day operations of TDC, that in such event the court stay its order pending appeal. It is the intent of this motion to maintain the *status quo* as to such issues all of which, in whole or in part, portend serious intrusions into the ambit of responsibility placed upon state government and as to which federal courts should stay their hand pending final adjudication of the constitutional issues involved under this country's basic concept of government distinguishing between the sovereignty allocated to the states and that to the federal government."

cated that most of the terms of his injunction and the consent decree are similar to relief approved by this court and other courts in prison cases involving constitutional infirmities of comparable magnitude. However, he did recognize that five major portions of the injunctive relief he ordered involved unsettled or unexplored areas of law. The first of these issues involves the provision for the single-celling of inmates, which at the time of the court's order was then pending before the United States Supreme Court.[5] The second issue involving a new application of accepted remedial measures consists of the court's order requiring conditional release of a number of inmates through statutorily authorized furlough and work furlough programs. The remaining three unsettled areas of law embraced in the district court's injunction are: (1) the managerial reorganization of the Texas Department of Corrections so that the warden of any prison unit would be responsible for no more than 500 inmates; (2) the requirement that no future prison be constructed over 50 miles away from a major population center, unless the State can demonstrate that the new sites away from a major population center would allow for the recruitment of adequate personnel; and (3) the application of State health and safety statutes to TDC for the protection of inmates.

■ Under our construction of Rule 8(a), we believe the district court should have the opportunity to rule on the reasons and evidence presented in support of a stay, unless it clearly appears that further arguments in support of the stay would be pointless in the district court. It is clear that, with respect to some of the contentions and affidavits presented in and with the State's motion for stay pending appeal, the district court would not be hearing anything new that would affect its decision after 159 days of trial, during which 349 witnesses testified and some 1565 exhibits were received in evidence, and untold hours of argument. However, it is also apparent from the materials presented to this court in support of the State's motion for stay that some of these matters were not presented to the district judge and should be so considered by him prior to any action by this court.

## IV.

The State is entitled to a measure of relief, which we now address.

### A. Overcrowding

#### 1. Single-celling.

■ We stay those portions of the district court's injunction requiring the single-celling of inmates beginning on August 1, 1982, with complete single-celling of all inmates due by August 1, 1983. In light of the Supreme Court's recent decision in *Rhodes v. Chapman*, —— U.S. ——, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), and its decision in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), we believe the State has made a substantial case on the merits respecting the serious legal question whether single-celling of inmates at TDC is constitutionally required under the district court's findings of fact. In *Rhodes v. Chapman*, the district court had ordered the single-celling of inmates at the Southern Ohio Correctional Facility (SOCF), a maximum-security state prison. —— U.S. at ——, 101 S.Ct. at 2397. Inmates at SOCF were housed in cells measuring approximately 63 square feet. Each cell contained a bed, cabinet, nightstand, a wall-mounted sink, and a toilet which could be flushed from inside the cell. Those cells housing two inmates have a two-tiered bunk bed, instead of a single bed. In addition, the cells at SOCF all have a cabinet, shelf, and radio built into one of the walls.

The majority of cells in TDC units are 45 square feet in size. However, the district court noted that there are variations in the sizes of TDC cells ranging from 40 to 66

---

5. The Supreme Court has since handed down its decision in *Rhodes v. Chapman*, —— U.S. ——, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), in which the Court held that single-celling was not constitutionally mandated under the circumstances of that case.

square feet. Without having the complete record before us, we have no way of knowing how many larger cells there are at TDC. We know only that the vast majority of cells are 45 square feet. *See Ruiz*, 503 F.Supp. at 1277 n. 7. The 45 square feet cells at TDC were originally designed to hold one inmate each. Where inmates are double-celled, a second bed has been added to these cells in bunk bed fashion. "Typical cells are equipped with two steel frame bunks (one above the other) attached like shelves to the wall, a sink, a toilet, a narrow shelf above the front bars, and naked light bulb." *Id.* at 1278. The district court found that the usable, unobstructed space in a typical TDC cell amounts to an area approximately 7½ feet long by 3 feet wide, totaling 22.5 square feet. *Id.* With respect to the adverse effects of double-celling, the district court made these findings of fact:

> "Director Estelle himself noted the exigent problems associated with double-celling, making reference to the increased opportunity for predatory activities and the enhanced difficulties respecting supervision and control. TDC inmates are routinely subjected to brutality, extortion, and rape at the hands of their cell mates. Some of the most heinous examples have occurred in triple-celling situations, where two-on-one confrontations practically guarantee the capitulation of the abused third cell mate. However, the problems of violence also occur all too frequently in double-celling situations, where one inmate often dominates the other. The evidence made it clear that, even if inmates were doubled up in cells large enough to accommodate two persons, the effects of violence and the climate of fear would remain. This is because of two factors: (1) TDC's rudimentary system of inmate classification is totally inadequate to assure the peaceful compatibility of cell mates; and (2) TDC's security and supervision capabilities fall far short of being able to protect inmates from potential violence at the hands of cell mates."

503 F.Supp. at 1281–1282 (footnotes omitted).

Although the cells in *Rhodes v. Chapman* were 63 square feet, with 31.5 square feet per inmate, while the majority of cells in this case are 45 square feet, with 22.5 square feet per inmate, we do not believe there is any constitutionally mandated square footage requirement per prisoner so long as the totality of conditions do not constitute cruel and unusual punishment. *Cf. Rhodes v. Chapman*, —— U.S. at —— — ——, 101 S.Ct. at 2395–2396; *Newman v. Alabama*, 559 F.2d 283, 288 (5th Cir. 1977); *Williams v. Edwards*, 547 F.2d 1206, 1215 (5th Cir. 1977).

In support of its decision to order single-celling, the district court reasoned that the floor area of the average cell at TDC is closer to 45 than 65 square feet. Also the court noted that a substantial proportion of inmates at TDC are not free to move about since they are either not assigned to a work detail, or in a medical lay-in status, or are in administrative segregation. With respect to the inmates who work, the court noted that their movements are highly regimented and that they must spend an average of 10 hours a day in their cells on working days and much more on weekends. The district court expressly relied on the fact that inmates at TDC must endure double-celling for months or years on end.

In *Rhodes v. Chapman*, the district court relied on the following factors to support its conclusion that double-celling was unconstitutional at SOCF:

> "The long terms of imprisonment served by inmates . . .; the fact that SOCF housed 38% more inmates than its 'design capacity'; the recommendation of several studies that each inmate have at least 50–55 square feet of living quarters; the suggestion that double celled inmates spend most of their time in their cells with their cell mates; and the fact that double celling at SOCF was not a temporary condition."

—— U.S. at ——, 101 S.Ct. at 2399. The Supreme Court expressly held that the general conditions relied upon by the district court for its conclusion that double-celling

is unconstitutional "fall far short in themselves of proving cruel and unusual punishment, for there is no evidence that double celling under these circumstances either inflicts unnecessary or wanton pain or is grossly disproportionate to the severity of crimes warranting imprisonment. At most these considerations amount to a theory that double celling inflicts pain." *Id.* —— U.S. at ——–——, 101 S.Ct. at 2399–2400 (footnotes omitted). The Court concluded that "the Constitution does not mandate comfortable prisons ..." and that maximum security prisons, designed to house persons convicted of serious crimes, cannot be free of discomfort. *Id.* —— U.S. at ——, 101 S.Ct. at 2400. The considerations of an ideal environment for long-term confinement of convicted felons "properly are weighed by the legislature and prison administration rather than a court." *Id.*

Since the district court's order would resolve inmate classification and security staffing problems (the two reasons cited by the court in support of its conclusion that the double-celling of inmates at TDC would not eliminate the effects of violence and the climate of fear at TDC), we conclude that there is a substantial question whether the portion of the court's injunction mandating single-celling will be upheld on appeal. This would be especially true of those cells at TDC which are larger than 45 square feet.

We conclude that the balance of equities favor a stay of the court's order mandating single-celling in order to maintain the status quo pending final determination of the issue on appeal. In its order overruling the State's motion for stay, the district court indicated that no stay was needed because the deadlines for single-celling are not until August 1, 1982, and August 1, 1983. We believe the district court failed to realize that TDC must begin to act now in order to meet these deadlines. If TDC waits until this court has handed down its decision on the merits before beginning to plan for and implement the requirement of single-celling, it would not be able to meet the deadlines set forth in the injunction if it were to lose the appeal, and TDC officials would face contempt of court.

Also we feel compelled to note that, because of the enormous size of the record in this case (159 days of trial and untold pretrial motions and arguments), the length of the district court's opinion (spanning 126 pages of the Federal Supplement), plus the complexity and seriousness of the legal issues involved, we cannot be certain that the decision on the merits by this court will occur before the August 1, 1982, deadline that no more than 50% of the inmate population be housed in cells of 60 square feet or less holding two prisoners. It is even possible that this court might not hand down its decision on the merits until after the November 1, 1982, deadline that TDC reduce its overall inmate population to a figure equal to 1.5 times the number of general population cells, plus the number of inmates who can be housed in dormitories affording 60 square feet per prisoner.

We find that the granting of a stay on this point would create no appreciable harm to the class of inmate plaintiffs since the most egregious forms of overcrowding (*i. e.* triple-celling and quadruple-celling) must be corrected pursuant to the district court's injunction. Moreover, the public interest is best served in this case by maintaining the status quo with regard to the single-celling order until the merits are decided on appeal. If the State prevails on appeal, the public is best served by not placing on the State the personnel and monetary burdens of implementing the single-celling requirement in time to meet the deadlines imposed in the court's order.

### 2. *Rotation of Triple-Celled Inmates.*

We stay that portion of the district court's order requiring that, during the interim before triple-celling must be terminated (by August 1, 1981), "no prisoner may be confined in any cell with more than one other prisoner for more than 10 days during any 30 day period." The State does not seek a stay of the portion of the injunction prohibiting triple-celling of inmates after August 1, 1981. Instead, it only seeks to

stay the rotation provision. The balance of equities weigh greatly in favor of granting the stay because of the undue burden that the rotation requirement will place upon TDC and the class of plaintiff inmates. According to the affidavit of Lester H. Beaird, an Assistant Director of TDC for Treatment, the temporary rotation requirement of triple-celled inmates "has the potential to create a dangerous situation for all inmates involved." This is because implementation of the rotation provision would greatly reduce the capacity of the staff in each prison unit to make the safest possible triple cell assignments and would, in Beaird's opinion, lead to an increase in violence in the cells that contain three inmates. We think it clear that the mandatory rotation provision might well irreparably harm TDC and the class of inmate plaintiffs because it would inhibit the ability of staff in each prison unit to become acquainted with the inmate population so as to identify and classify inmates who are likely to exploit a third inmate housed with them in a cell. (Beaird recognized that in a sense TDC indirectly penalizes the better behaved inmates by triple-celling them with other such inmates.)

Moreover, the requirement that no single inmate be in a triple-celled cell for more than 10 days out of every 30 days would play havoc with TDC's ability to comply with the consent decree entered in *Lamar v. Coffield,* (No. 72–H–1393, Southern District of Texas, Houston Division), which mandates the racial integration of inmates in cell blocks and dormitories. TDC's efforts to comply with the quotas laid down in *Lamar v. Coffield* would be seriously and adversely affected by the temporary rotation system for triple-celled inmates set forth in the injunction. We conclude the public interest is best served by staying this portion of the injunction.

### 3. *Work and Temporary Furloughs.*

■ The State seeks to stay that part of the injunction requiring the Texas Department of Corrections to release a specified number of inmates on work furlough and on temporary furlough on specific dates. Specifically, the district court's order mandates that by November 1, 1981, 300 inmates be released on work furlough, by May 1, 1982, at least 1,200 inmates be released on work furlough, and by November 1, 1982, at least 2,500 inmates be released on work furlough. In addition, by November 1, 1981, at least 300 inmates must be released on temporary furlough, by May 1, 1982, at least 600 inmates must be released on temporary furlough, and by November 1, 1982, at least 1,000 inmates must be released on temporary furlough.

The work furlough program is authorized by Tex.Rev.Civ.Stat.Ann. art. 6166x–3 (Vernon Supp.1980–81). This statute invests TDC with discretion as to whether it will grant work furlough privileges as authorized by the statute. A program of temporary furloughs for inmates to allow them to attend funerals and visit critically ill relatives, or for any other reason that TDC determines to be appropriate, is provided for by Tex.Rev.Civ.Stat.Ann. art. 6184n, § 2 (Vernon Supp.1980–81). Again, as with the statute authorizing work furloughs, this statute vests discretion in TDC as to when temporary furloughs will be granted.

There is a substantial basis for the State's success in setting aside the district court's order requiring that 300 inmates be placed on work furlough and 300 on temporary furlough by November 1, 1981, that a total of 1,200 inmates be placed on work furlough and another 600 on temporary furlough by May 1, 1982, and that a total of 2,500 inmates be placed on work furlough and another 1,000 on temporary furlough by November 1, 1982. It is likely that the district court's injunction specifying a minimum number of inmates to be placed on these furlough programs and accompanying deadlines will be held on the merits to be an undue interference with the operation of the State's prison system. We believe the rule to be that a district court in exercising its remedial powers may order a prison's population reduced in order to alleviate unconstitutional conditions, but the details of inmate population reduction should largely be left to prison administrators. This is

consistent with the policy of minimum intrusion into the affairs of state prison administration that the Supreme Court has articulated for the federal courts. *See Williams v. Edwards*, 547 F.2d 1206, 1212 (5th Cir. 1977). Although it is within the district court's authority to order that constitutional violations be rectified if a prison is to remain open, in large part the details of bringing a prison into compliance with the Constitution should remain with state prison officials.

We also conclude that the State will sustain irreparable injury if the district court's order requiring that a specified number of inmates be placed on work furlough and temporary furlough by certain deadlines is not stayed pending appeal. The statute authorizing the placement of inmates on work furlough sets forth the conditions to which TDC is subject when securing employment for eligible prisoners. Some of these conditions include: that a work furlough job must be at a wage rate at least as high as the prevailing wage for similar work in the community where the work will be performed and that the inmate on work furlough must be employed in accordance with the prevailing working conditions in the area; the work furlough program may not result in a displacement of already employed workers or include occupations, skills, crafts, or trades in which there is a surplus of available and qualified workers in the area, the existence of which must be determined by the Texas Employment Commission; that a work furlough employer must release his work furlough inmate employees prior to releasing any of his regular employees if he determines to reduce his labor force; and that not more than 10% of a work furlough employer's labor force may be composed of work furlough inmates, unless a prior special emergency approval is obtained from the Texas Work Furlough Program Advisory Board. Tex.Rev.Civ. Stat.Ann. art. 6166x–3, § 4(1), (2), (5), (6) (Vernon Supp.1980–81).

TDC is faced with an administrative nightmare in order to comply with the district court's quotas and deadlines, the first of which is November 1, 1981. Moreover, it is unlikely that TDC would be able to meet these quotas and deadlines given the statutory conditions with which it must comply and over which it has no control. Also, in order to comply with the court's order, we must assume that TDC will have available to it a sufficient number of "eligible" inmates in order to meet the specified quotas and concomitant deadlines. Additionally, we must assume that a sufficient number of employers can be persuaded to participate in the work furlough program. We feel the burden upon TDC in terms of time, expense, and administrative red tape is too great.

With respect to temporary furloughs, an even greater showing of irreparable injury if the stay is not granted has been made. The statute authorizing temporary furloughs (TDC refers to these as "situational" furloughs) provides that TDC may grant temporary furloughs of not more than five days to inmates who are considered acceptable security risks, but that TDC may extend a temporary furlough for up to 10 days when the circumstances justify a longer furlough. However, TDC is precluded from granting more than two such temporary furloughs during a calendar year without authority from the Board of Pardons and Paroles and of the governor. Tex.Rev.Civ. Stat.Ann. art. 6184n, § 2 (Vernon Supp. 1980–81). Moreover, the statute clearly contemplates that these furloughs are to accord temporary relief from incarceration only and are not designed to replace traditional methods of permanent return to society such as parole, discharge, mandatory supervision, or clemency. Indeed, the statute states that temporary furloughs are granted only for inmates to attend funerals, to visit critically ill relatives, or for other appropriate reasons.

The affidavit of a TDC official having knowledge of the situational furlough program (Sherrel O. Woods, Jr.) indicates that since the beginning of the program in September of 1979 a total of 5,162 temporary furloughs have been granted for an average of 288 temporary furloughs per month. This TDC official attests that the district

court's arbitrary levels of 300 inmates per day on temporary furlough by November 1, 1981, 600 inmates per day by May 1, 1982, and a minimum of 1,000 per day by November 1, 1982, is extremely dangerous and in all likelihood impossible to obtain. This is so because the 300 inmates per day mandate would require a minimum pool of 10,950 acceptable inmates for temporary release. The 600 inmates per day quota would require a minimum pool of 21,900 inmates who are acceptable for temporary release, and the 1,000 inmates per day quota would require a minimum pool of 36,500 acceptable inmates given the total time which any one inmate may be released on furlough during any calendar year. This official attests that any professional and competent review of TDC's inmate population would reveal that it does not have enough prisoners to meet the quotas set by the district court in accordance with the standards as required by statute. This is significant when one considers that the average inmate population of TDC for the calendar year of 1981 is 30,156.

With respect to the third factor, we conclude that granting the stay of the district court's order relative to the release of specified quotas of inmates on temporary and work furlough by specified dates would not substantially harm the class of inmate plaintiffs. This is so because (1) many of the unconstitutional conditions at TDC are to be eliminated pursuant to the consent decree entered into between the parties and the portions of the district court's injunction that we do not stay, (2) overcrowded conditions at TDC have already been ameliorated by the temporary housing of numerous inmates in military tents while permanent construction is planned and implemented, and (3) the Board of Pardons and Paroles has recently received $1.25 million to implement a program by which 1,500 convicted felons currently incarcerated in TDC will be released to half-way houses throughout Texas beginning July of 1981. See Affidavit of Ruben M. Torres, Chairman of the Texas Board of Pardons and Paroles. The Torres affidavit also indicates that $3.5 million will become available in September of 1981 under a legislative appropriation signed into law on May 14, 1981, to continue the program of releasing inmates to half-way houses.

Finally, we conclude that the public interest is best served by leaving the details of reducing overcrowding in TDC to Texas prison officials. It is sufficient that the district court has ordered the overcrowding to be eliminated.

### 4. Review of Good Time Credits.

■ The State seeks to stay that portion of the injunction requiring TDC by November 1, 1981, to review the record of every inmate who has not received credit for State Approved Trusty III good time for the entire period of his incarceration and to consider whether such an inmate should be credited with some part or all of such good time.

We deny the motion to stay with respect to this aspect of the injunction since we construe it to require that TDC only review inmates' records to ensure that all those who are entitled to good time credit have received it.

### 5. Community Corrections.

■ We stay that part of the district court's order requiring TDC to expand its role in community corrections by establishing minimum security institutions, honor farms, half-way houses, urban work and educational release centers, community treatment centers, and the like. The State's position has substantial merit since the Constitution does not mandate a state to provide community corrections. It only requires that convicted felons not be punished cruelly and unusually. The Constitution does not mandate rehabilitation; instead, it contemplates punishment for convicted criminals by requiring that such punishment not be cruel and unusual. Cf. Rhodes v. Chapman, —— U.S. at ——, 101 S. Ct. at 2397. No matter how desirable community corrections may be their use is a policy matter for the people of the state to decide—acting through their legislative repre-

sentatives. Irreparable injury to the movant is established by the fact that TDC must go to the effort and expense of furnishing the district court with a plan for the establishment of such community correction facilities by November 1, 1981, with or without participation of other state or local agencies. The balance of equities requires that we maintain the status quo with respect to this portion of the court's order, and the public interest is best served by maintaining the status quo here.

## B. *Site Selection & Reorganization of TDC Units*

■ We stay that portion of the district court's injunction requiring TDC to submit a plan to the court by November 1, 1981, providing for the reorganization and decentralization of the management of each TDC unit housing more than 500 inmates. The injunction requires the plan to ensure that existing units are subdivided into sub-units housing no more than 500 inmates and that each warden be responsible for no more than 500 prisoners. The plan must also provide for the architectural modification and retrofitting of existing units necessary to create the sub-units of 500 or less inmates. These architectural modifications and retrofitting must be completed before November 1, 1982.

We conclude that the State has demonstrated a likelihood of success on the merits as to this issue. Although a district court's remedial authority to correct unconstitutional conditions in prisons is broad, we do not believe that the court had the power to alter the managerial structure and size of existing TDC units, especially in light of the court's ruling that the size and structure of TDC prisons do not create harms of constitutional magnitude. *See Ruiz*, 503 F.Supp. at 1387. The size and managerial organization of a state prison system would appear to be matters that are best left to a state's legislature and to those charged with the responsibility for running the prison system.

We also conclude that TDC will suffer irreparable injury if this portion of the in-

junction is not stayed pending appeal. TDC is required to submit to the district court by November 1, 1981, a plan assuring that all the architectural modifications and retrofitting required for the reorganization will be completed before November 1, 1982. Given the magnitude of the structural and administrative changes that the injunction would require, we have no reason to question the State's assertion in its motion that "it is virtually impossible for TDC to implement and complete a type of reorganization plan called for by the district court by November 1, 1982." Finding no harm to the class of inmate plaintiffs, we think the public interest would be better served by issuance of a stay under these circumstances.

■ Furthermore, we stay that portion of the injunction providing that TDC may not make final site selection for or undertake the construction of any new prison units unless it has filed with the court a plan demonstrating that certain conditions have been met. These conditions include: (1) that the population of the prison unit will not exceed 500 inmates or the unit will be so structured that the population of each organizational sub-unit will not exceed 500 inmates, and (2) the unit will not be located more than 50 miles from a major metropolitan area, unless TDC demonstrates that it is able to recruit adequate numbers of qualified professionals, paraprofessionals, and others necessary to operate the unit in a constitutional manner. Insofar as the injunction requires TDC to construct units that house no more than 500 inmates or that may be divided into sub-units housing no more than 500 inmates, we stay that part of the order for reasons similar to those set forth above. In light of the district court's finding that the size and structure of TDC units do not create harms of constitutional dimension, the injunction is unduly restrictive of TDC's right to determine the size and administrative organization of its components. Irreparable injury will be sustained by TDC because, absent a stay, it will be required either to suspend all new construction or to construct only units that comply with the size limitations man-

dated by the injunction. Given the urgent need for additional facilities for inmate housing to relieve the overcrowding at TDC, the balance of equities clearly lies in favor of staying this portion of the district court's order pending appeal.

■ With respect to that portion of the injunction relating to the location of future TDC units, we know of no constitutional mandate for correctional units to be situated within 50 miles of a major metropolitan area in order to ensure adequate staffing. Therefore, we conclude that the State has made a substantial case on the merits with likelihood of success on appeal in relation to the location requirements for new construction.

It is argued that the State will suffer no irreparable injury as a result of the injunction's location requirement for future construction. This is so, the argument proceeds, because TDC may construct new units more than 50 miles away from a major metropolitan area by demonstrating that it will be able to recruit the personnel needed to run the new unit in a constitutional manner. The argument continues that while the requirement to make such a showing may indeed inconvenience TDC, TDC will not suffer irreparable harm if, during the pendency of this appeal, it is required to demonstrate to the district court that it will be able to adequately staff a proposed new unit over 50 miles away from a major metropolitan area. However, this argument fails to take into consideration the steps that TDC must undertake before it is able to acquire land for the location of a new prison and the construction of such a facility.

An example of the protracted process that TDC must go through in order to secure approval of a new prison site is seen in the new proposed Grimes County facility. According to the affidavit of Jack D. Kyle, Assistant Director of TDC for Business, a budget request was submitted in July of 1976 prior to the legislative session which began in January of 1977. TDC requested an appropriation of funds for the construction of a new site in West Texas. Funds for the acquisition of a site for this unit were provided, effective on September 1, 1977. However, an attorney general's opinion questioned the grant of authority in the legislative act for making the purchase, and this delayed the purchase of land for the new unit until 1979 when the new legislature met. A proposed site was selected and submitted for consideration by the approval board consisting of the governor, the state land commissioner, and the chairman of TDC. In May of 1980, the board denied approval of this site. New sites were then considered, and TDC eventually recommended a site in Grimes County. In November of 1980, the board approved this particular site. However, landowners in Grimes County filed suit in state court to enjoin the purchase of the land. Because of this litigation, land for the Grimes County Unit was not purchased until March 31, 1981.

The requirements of the injunction would place TDC in an untenable position. It would be extremely difficult for TDC to negotiate with landowners for a particular site since there would always be uncertainty as to whether the district court would ultimately approve or disapprove the site. It should be noted that we would not let these difficulties prevent the rectification of an unconstitutional treatment of prisoners, but federal courts must always consider the consequences to everyone of their orders. And at this point we are considering the burden or harm to the State of the present injunction.

When projected inmate population indicates the necessity of new facilities, the State should be allowed to pursue and resolve the requirement for new facilities within the framework of its own law. If the district court involves itself in site acquisition, then additional delays are surely guaranteed. With the need being so urgent for new facilities to alleviate inmate overcrowding, it is in the interest of all parties and the public that the location requirements of the district court's order be stayed pending appeal.

In the 1981 legislative session, $35 million was appropriated for the construction of three additional housing facilities at three existing prison units. According to the Kyle affidavit, it is anticipated that construction of these additional facilities will begin in the near future and will be handled through private contractors rather than inmate labor. Since these new housing units will provide 960 beds each, it is essential that construction proceed without further delay. If TDC is required to submit a report to the district court showing that it is able to recruit and maintain adequate numbers of qualified professionals, paraprofessionals and others to staff these new housing facilities, 'and obtain the court's approval, as is required by the injunction, further delay in alleviating overcrowded conditions at TDC will unquestionably result.

Bobby T. Maggard, Assistant Director for Special Services at TDC, states in his affidavit that it may be *more* difficult for TDC to retain entry level personnel at facilities located 50 miles or less from major industrial areas. For example, the affidavit recites TDC's problem in recruiting and maintaining security personnel at units near the highly industrialized Houston area because of the relatively low wages at TDC in comparison to major industrial employers. In recent years TDC has been more successful in the recruitment of professional and paraprofessional staff in rural areas because of the growing tendency among such people to seek employment in smaller towns and rural areas, which have a better quality of life in comparison to the daily frustrations of modern urban life. The affidavit states that the injunction's requirement to locate new facilities within 50 miles of a major metropolitan area would adversely affect TDC's efforts to recruit and maintain security staff at entry level, while not necessarily improving the agency's recruitment and retention of professional and paraprofessional staff.

### C. *Staffing*

The injunction requires TDC to maintain a specified minimum security staffing pattern by November 1, 1982. However, the district court has suggested that alternative staffing patterns are to be considered. If TDC believes that the minimal staffing pattern outlined in the injunction is unnecessary to the protection of inmates as to a specific cell block or dormitory, the order provides that TDC may file a report with the special master delineating the reasons why the staffing pattern described in the court's order is unnecessary. If the special master, after allowing objections from the plaintiffs, agrees with TDC, he may order relief from the injunction regarding staffing patterns, provided that TDC complies with any alternative staffing pattern that he prescribes. We expressly disapprove of this procedure since it expands the special master's function of monitoring compliance and making reports to the district court as contemplated by Fed.R. Civ.P. 53(c). *See Gary W. v. Louisiana*, 601 F.2d 240, 245 (5th Cir. 1979). The State should present to the district court, in any new motion to stay or modify the court's order, any problems with the present injunction regarding staffing patterns and any alternative staffing patterns it wishes to suggest.

As to all other portions of the injunction dealing with security staffing, we deny the State's present motion to stay pending appeal.

### D. *Inmate Jobs (Building Tenders)*

We stay that portion of the injunction requiring inmates who perform duties heretofore performed by prisoners under the building tender system to be rotated at least every 30 days. There is a likelihood that the State will prevail on the merits as to this issue since, so long as no inmate or group of inmates is placed in a position having administrative or supervisory authority over other inmates, the requirement of rotating these inmate job assignments every 30 days would appear to constitute an undue interference with the minutiae of prison administration. *See Bell v. Wolfish*, 441 U.S. at 545–546, 99 S.Ct. at 1877.

Based upon the supporting affidavits, we conclude that TDC would suffer irreparable

injury if the district court's order mandating inmate job rotation is not stayed pending appeal. The affidavit of Don H. Costilow, Warden of the Wynne Prison Unit, indicates that the mandated inmate job rotation system would constitute an administrative nightmare, accomplishing nothing except confusion. Costilow states significantly that "[a]ny person, whether that person be an inmate or a free person, is not going to take very much pride in his work if he knows the job will only last for 30 days."

An affidavit by Richard A. Hartley, Administrative Assistant to the Director of TDC, states that the mandated inmate job rotation fails to consider the serious classification and security problems created by the intermingling of different classifications of inmates. Hartley also indicates that the training time needed for these building jobs would be wasted by rotating the job assignments every 30 days and that inmate morale would decline as a result of not providing job stability. Under the system as it operates now, inmates in building job assignments have been screened by the TDC's classification committee, and many of these inmates are earning maximum good time allowances. A system of mandatory rotation in these job assignments would destroy the classification procedures established for the protection and proper placement of inmates.

The affidavit of Edward H. Turner, Warden of the Eastham Prison Unit, indicates that the average inmate would require more than 30 days to learn to perform in a building work assignment and that the rotating of building jobs every 30 days would "kill the morale of inmates assigned to these various jobs. These inmates take pride in working in jobs which they have earned while bettering themselves to return to society." Turner opines that to place an inmate whose attitude and conduct is not good in these building assignment jobs would be destructive of correctional discipline and rehabilitation.

The affidavit of Linda Woodman, Warden of the Gatesville Prison Unit, states that the 30 day job rotation requirement would impair an efficient prison unit. For example, she indicates that only a small portion of inmates are medically clear to work in the kitchen. If under the 30 day rotation it is the turn for the bread cook or the meat cook to clean their dormitory, operation of the entire unit would be upset. Moreover, Woodman attests that job security is normally important to inmates and that they do not like to be shuffled from job to job. She states that most requests for job changes come during the first two weeks on a job. Inmates who have settled into a routine are usually content. However, after about six months on a job some inmates feel that they have mastered that task and wish to move onto something new, while others want to stay where they feel secure in their ability. Woodman indicates that managing job assignments on the basis of these inmate concerns would be impossible under the court mandated 30 day rotation system.

Based upon our reading of the aforementioned affidavits, it is apparent that the class of inmate plaintiffs would suffer no appreciable harm by staying that portion of the court's order mandating the 30 day rotation in building assignment jobs, so long as inmates in these jobs do not possess administrative or supervisory authority over the other inmates. All of these affidavits indicate that inmate morale is likely to decline under such a rotation system. The public interest favors a stay pending appeal of that aspect of the court's order that would disrupt inmate morale and interfere with security classification procedures. Moreover, the public interest favors an efficient operation in regard to TDC's housekeeping and building job assignments.

The State's motion to stay any other portion of the injunction relating to inmate job assignments and the building tender system is denied.

### E. *Huntsville Unit Hospital*

In seeking to stay the portion of the injunction that requires the downgrading of the Huntsville Unit Hospital to use solely as an infirmary by November 1, 1981, unless the hospital can be brought into com-

pliance with standards of the Texas Hospital Association or the Joint Commission on Accreditation of Hospitals by that date, the State has supplied the affidavit of Dr. Ralph Edward Gray, Assistant Director of TDC for Health Services. Dr. Gray states that the Huntsville Unit Hospital provides emergency, acute, and convalescent care to inmates in the custody of TDC. Dr. Gray indicates that there have been numerous improvements in the medical care provided at the hospital since the conclusion of the trial in this case.

For example, 16 positions have been added to the hospital's staff, including a part-time dentist in oral surgery, a podiatrist, an emergency room physician's assistant, a registered nurse, an administrative technician II in drug room inventory, a full-time pharmacist, three licensed vocational nurses, an upgraded medical assistant II for respiratory therapy and E.K.G., two medical assistants I, two administrative technicians II, a security officer in medical supply, and a medical assistant I in podiatry and E.E.G. Also several existing positions, unfilled at the time of trial, have been filled since September of 1979. These include a part-time physician in internal medicine, a part-time physician for coverage on weekends, a full-time dentist, three part-time dentists, and an administrative technician IV. The affidavit also lists numerous equipment improvements and additions, one example being an emergency telemetry network that provides 24 hour access to John Sealy Hospital medical staff and is fully operational for all TDC prison units.

In addition, Dr. Gray indicates that a fire escape has been installed at the hospital, providing an exit for each of the hospital's five floors. An auxiliary generator now ensures that essential lights and power for operating and emergency rooms are maintained at all times. Dr. Gray also states that the hospital has instituted a concept of progressive care under which those inmate plaintiffs requiring the most acute medical and surgical care are concentrated on the fourth floor of the hospital where the highest concentration of medical staff is located. The affidavit sets forth in detail the costs per bed and the limited number of hospital beds in the area surrounding the Huntsville Unit that are available for use in providing hospital care for TDC inmates. A reading of Dr. Gray's affidavit leads to the inescapable conclusion that free world hospitals in the area surrounding Huntsville cannot accommodate the average of 100 to 120 inmates who daily are patients in the Huntsville Unit Hospital.

In light of TDC's apparent good faith efforts to improve the quality of health care at the Huntsville Unit Hospital, the equities may favor a stay of that part of the injunction requiring the downgrading of the Huntsville Unit Hospital to an infirmary. Given the health benefits inmates can reasonably expect to receive from the improved care now being rendered at the Huntsville Unit Hospital, and the fact that construction of the John Sealy Hospital will be completed in the near future, a stay pending appeal of the district court's order insofar as it relates to the Huntsville Unit Hospital may be appropriate. However, it is clear that the facts set forth in the State's motion for stay and in Dr. Gray's affidavit regarding the Huntsville Unit Hospital were never presented to the district court. The State is entitled to present these facts to the district court in a motion to modify or a new motion to stay.

### V.

In conclusion it is ORDERED that the State's motion to stay the district court's order pending appeal is GRANTED in the following respects:

(1) Those aspects of the injunction requiring the single-celling of inmates, beginning in part on August 1, 1982, with full implementation on November 1, 1983 [see district court's order, Parts I.B.(3), (4); I.E.; VII.A.(3), (4); VII.C.(1), (2)—see text *supra*, Parts I.A.(1), (2), (4); I.B.(1)(c), (d); I.B.(3)(a), (b)] are stayed pending appeal.

(2) That portion of the injunction requiring that TDC may not confine

any inmate in a cell containing two other inmates for more than 10 days during any 30 day period [*see* district court's order, Part I.D.—*see* text *supra*, Part I.A.(3)] is stayed pending appeal.

(3) That part of the injunction requiring TDC to release a specified number of inmates on work furlough and on temporary furlough by specified deadlines [*see* district court's order, Part I.A.(1)(c), (d); I.A.(4), (5)—*see* text *supra*, Part I.A.(6), (7)] is stayed pending appeal.

(4) That part of the injunction requiring TDC to expand community corrections by establishing minimum security institutions, honor farms, halfway houses, urban work and educational release centers, community treatment centers, and the like [*see* district court's order, Part I.A.(6)—*see* text *supra*, Part I.A.(9)] is stayed pending appeal.

(5) That part of the injunction requiring TDC not to make final selection of a site, nor undertake the construction of any new units, for housing of inmates unless it has filed a report with the court demonstrating that certain conditions are met [*see* district court's order, Part VII.A.—*see* text *supra*, Part I.B.(1)] is stayed pending appeal.

(6) That part of the injunction requiring TDC to file a report with the court by August 1, 1981, demonstrating that certain conditions are met with respect to the Beto Unit (now under construction) and the proposed Grimes County Unit [*see* district court's order, Part VII.B.—*see* text *supra*, Part I.B.(2)] is stayed pending appeal.

(7) That part of the injunction prohibiting TDC from undertaking construction of any new facilities or cell blocks at existing prison units unless it has filed a report with the court demonstrating that certain conditions are met [*see* district court's or-

der, Part VII.C.—*see* text *supra*, Part I.B.(3)] is stayed pending appeal.

(8) That part of the injunction requiring TDC to submit to the court a plan providing for the reorganization and decentralization of the management of TDC into units and sub-units housing no more than 500 inmates [*see* district court's order, Part VIII.—*see* text *supra*, Part I.C.] is stayed pending appeal.

(9) That part of the injunction requiring approval from the special master of any alternative security staffing patterns [*see* district court's order, Part II.A.(3)—*see* text *supra*, Part I.D.(3)] is stayed pending appeal.

(10) That part of the injunction requiring the mandatory rotation of inmate building assignment jobs every 30 days [*see* district court's order, Part II.D.(1)—*see* text *supra*, Part I.E.(2)] is stayed pending appeal.

Having failed to make the required showing of likelihood of success on appeal and that it will sustain irreparable harm if a stay is not granted, it is ORDERED that the State's motion for stay of the district court's order pending appeal is in all other respects DENIED.

However, as with the Huntsville Unit Hospital, the State is free to develop grounds for a stay pending appeal or modification of the injunction in new motions to the district court prior to seeking further extraordinary relief in this court. This avenue is available to the State because there may well be other matters in the lower court's order that may impose problems and undue hardships in the details of execution which should be brought to the attention of the district court before we attempt to interfere on a motion to stay pending appeal. Nothing in this order, or any further recourse which we have suggested in the district court, should be taken as cause to delay the appeal of the injunction, and the State is free to pursue that appeal with dispatch.

This panel retains jurisdiction of this case for all extraordinary relief sought by any party pending assignment to a panel of the court for consideration of the merits of the appeal. We suggest that the parties, by appropriate motion, advise the court when the record can be filed and what schedule for briefing will be required. The court will then be enabled to set the case for oral submission at the earliest date.