David R. RUIZ, et al.,
Plaintiffs-Appellees,

United States of America,
Intervenor-Appellee,

v.

W. J. ESTELLE, Jr., et al.,
Defendants-Appellants.

Nos. 81–2224, 81–2380 and 81–2390.

United States Court of Appeals,
Fifth Circuit.

Jan. 14, 1982.

---

Mark White, Atty. Gen. of Tex., Ed Idar, Jr., Douglas M. Becker, Asst. Attys. Gen., Pike Powers, Kenneth L. Petersen, Jr., Austin, Tex., Lee C. Clyburn, William R. Pakalka, Jerry E. Smith, Houston, Tex., Keith A. Jones, Washington, D. C., for defendants-appellants.

Donald W. Jackson, Edward J. Landry, Asst. County Attys., Houston, Tex., for Heard.

William Bennett Turner, San Francisco, Cal., Steven L. Winter, Joel Berger, Jack Greenberg, New York City, Samuel T. Briscoe, Dallas, Tex., for Ruiz, et al.

Jim D. Wiginton, Angleton, Tex., for L. D. Hilliard.

Dennis J. Dimsey, W. Bradford Reynolds, Attys., Appellate Section, Civ. Rights Div., U. S. Dept. of Justice, Washington, D. C., for the U. S.

David Crump, Susan E. Waite, The Legal Foundation of America, Houston, Tex., for amicus, The Legal Foundation of America.

Alvin J. Bronstein, Elizabeth Alexander, ACLU, Washington, D. C., for amicus, ACLU-National Prison Project.

Before CHARLES CLARK, Chief Judge, RUBIN and TATE, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The State of Texas for the second time asks us to stay some of the provisions of the injunctive decree rendered by the district court.[1] The decree requires the Texas Department of Corrections ("TDC") to make numerous changes in its prisons and their administration. In *Ruiz v. Estelle*, 650 F.2d 555 (5th Cir. 1981) (per curiam) (*Ruiz I*), we granted a stay of some provisions of the decree. The State then requested a stay of other provisions of the decree, first in the district court and then by appeal from the district court's refusal to grant the requested relief.[2] We provisionally granted the stay requested in the second motion so that we could fully consider the briefs and hear oral argument. As in *Ruiz I*, we act separately on each of the specific issues presented; we grant the motion in part and deny it in part.

## I

In *Ruiz I*, we reviewed the criteria to be applied in determining whether an appellate court should stay an injunction pending appeal. So well-established in this circuit as to be a rubric, these criteria are: (1) whether the movant has made a showing of likelihood of success on the merits, (2) whether the movant has made a showing of irreparable injury if the stay is not granted, (3) whether the granting of the stay would substantially harm the other parties, and (4) whether the granting of the stay would serve the public interest.

*Ruiz I*, 650 F.2d at 565 (citing cases).[3] The party who seeks a stay bears the burden of establishing these prerequisites. *Drummond v. Fulton County Dep't of Family & Children's Servs.*, 532 F.2d 1001, 1002 (5th Cir. 1976) (per curiam); *see Dendy v. Washington Hosp. Center*, 581 F.2d 990, 992 (D.C. Cir.1978) (per curiam); *Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970) (order by Winter, J.).[4]

In granting the stay in *Ruiz I*, we held that "on motions for stay pending appeal the movant need not *always* show a 'probability' of success on the merits; instead, the movant need only present a substantial case on the merits when a serious legal question is involved *and show that the balance of the equities weighs heavily in favor of granting the stay.*" 650 F.2d at 565 (emphasis added). In the short time that has elapsed since *Ruiz I*, many applicants for stay seem to have assumed that *Ruiz I* was a coup de grace for the likelihood-of-success criterion in this circuit. This assumption, however, is unwarranted, for it ignores the careful language of *Ruiz*

---

1. The district court's opinion contains a general description of the injunctive relief it granted. *Ruiz v. Estelle*, 503 F.Supp. 1265, 1385–90 (S.D. Tex.1980). The district court entered its original decree on April 20, 1981, and entered an amended version of this decree on May 1, 1981. All references in this opinion to the court's decree will be to the amended version, which will be cited thus: "Part _____." The full text of the amended decree is set forth in the Appendix to this opinion, pp. 862–873 *infra*.

2. Parts I(B)(2)–(4), I(F), II(A)(1)–(2), II(D), IV(C)(3), and VII(A)(4).

3. *Accord, Florida Businessmen for Free Enterprise v. City of Hollywood*, 648 F.2d 956, 957 (5th Cir. 1981); *MacBride v. Askew*, 541 F.2d 465, 467 (5th Cir. 1976); *Drummond v. Fulton County Dep't of Family & Children's Servs.*, 532 F.2d 1001 (5th Cir. 1976) (per curiam) (quoting *Beverly v. United States*, 468 F.2d 732,

740 n.13 (5th Cir. 1972)); *Pitcher v. Laird*, 415 F.2d 743, 744–45 (5th Cir. 1969) (per curiam) (quoting *Covington v. Schwartz*, 230 F.Supp. 249, 252 (N.D.Cal.1964), *modified and aff'd*, 341 F.2d 537 (9th Cir. 1965)).

4. "Issuance of a stay pending appeal is discretionary and equitable .... The movant bears the burden of proof." *Hayes v. City Univ. of N. Y.*, 503 F.Supp. 946, 962 (S.D.N.Y.), *aff'd sub nom. Hayes v. Human Resources Administration*, 648 F.2d 110 (2d Cir. 1981); *accord, BP Oil, Inc. v. Marshall*, 509 F.Supp. 802, 810 (E.D. Pa.1981); *Goldstein v. Miller*, 488 F.Supp. 156, 176 (D.Md.1980), *aff'd mem.*, 649 F.2d 863 (4th Cir. 1981); *Evans v. Buchanan*, 455 F.Supp. 705, 708 (D.Del.1978); *Kansas City Royals Baseball Corp. v. Major League Baseball Players Ass'n*, 409 F.Supp. 233, 268 (W.D.Mo.), *aff'd*, 536 F.2d 615 (8th Cir. 1976).

*I.*[5] Likelihood of success remains a prerequisite in the usual case even if it is not an invariable requirement. Only "if the balance of equities (*i.e.* consideration of the other three factors) is ... *heavily tilted* in the movant's favor" will we issue a stay in its absence, and, even then, the issue must be one with patent substantial merit. *Id.* at 565–66 (emphasis added). Guided by these considerations, we consider the State's present motion. In acting on it, whether favorably or unfavorably, we intimate no predetermination of the decision on the merits with regard to the entire decree or any aspect of it.

## II

### A. *Dormitory Space Requirements*

The district court's decree forbids TDC to "accept any further prisoners" if, by November 1, 1981, it has not reduced the "overall TDC population to a figure equal to twice the number of general population cells, plus the number of prisoners who can be housed in dormitories that afford forty square feet (excluding bathing, toilet and activity areas) per prisoner." Part I(B)(2). By November 1, 1982, TDC must calculate its permissible overall population on the basis of sixty square feet per dormitory prisoner. Part I(B)(3).[6] The decree also forbids TDC, after November 1, 1981, to "confine any prisoner to a dormitory providing less than forty square feet per prisoner," and, after November 1, 1982, less than sixty square feet per prisoner. Part I(F). Finally, the decree requires that, in "any new units for housing prisoners," TDC provide at least sixty square feet of space for "[a]ll prisoners classified as minimum security prisoners" who are placed in dormitories. Part VII(A)(4). The State asks us to stay these provisions.[7]

The TDC prisoner population is growing rapidly: 25,000 prisoners when this case was tried in 1979, and more than 30,000 when it was argued before this court. The overpopulation problem in TDC units is, therefore, being steadily exacerbated. The forty-square-feet-per-prisoner rule for dormitories would require TDC to provide other housing for 641 prisoners, located in twelve different units; the unit most seriously affected is Darrington, which must relocate 171 prisoners.[8] Enforcement of

5. The assumption also ignores "the firm rule of this circuit that we cannot disregard the precedent set by a prior panel, even though we perceive error in the precedent. Absent an intervening Supreme Court decision which changes the law, only the *en banc* court can make the change." *Wilson v. Taylor*, 658 F.2d 1021, 1034 (5th Cir. 1981); *accord, e.g., United States v. Colacurcio*, 659 F.2d 684, 687 (5th Cir. 1981); *Ford v. General Motors Corp.*, 656 F.2d 117, 119–20 (5th Cir. 1981).

6. Part I(B)(4) also includes this sixty-square-feet requirement in a formula for calculating the permissible overall TDC population. The formula in Part I(B)(4) is to take effect on November 1, 1983.

7. *Ruiz I* stayed the provisions of Parts I(B)(3)–(4) and VII(A)(4) that pertain to single-celling. 650 F.2d at 567–69, 577. It is not clear from the opinion in that case whether we also stayed the provision of Part VII(A)(4) that pertains to minimum square footage for dormitories in new units. *See* 650 F.2d at 560, 573–75, 578.

8. These figures are derived from information contained in the Housing Report filed by the Executive Division, Texas Dep't of Corrections (Nov. 1981), pursuant to Part I(B)(1) of the decree. Information derived from that report was used to prepare the following summary:

| UNIT | NUMBER OF DORMITORIES | NO. OF INMATES IN DORMITORIES IN EXCESS OF CAPACITY OF 40 SQ. FT. | NO. OF TENTS | NO. OF INMATES IN ADMINISTRATIVE SEGREGATION |
|---|---|---|---|---|
| Beto | –0– | –0– | –0– | 2 |
| Central | 12 | 91 | 32 | –0– |
| Clemens | 9 | 100 | –0– | 1 |
| Coffield | 4 | –0– | –0– | 168 |

this part of the decree would not, therefore, impose a massive relocation problem.

■ The district court's findings concerning the TDC dormitories portray conditions that are inhumane. Lack of space alone does not constitute cruel and unusual punishment, save perhaps in the most aggravated circumstances. The eighth amendment mandates no specific standard for prison housing. Whether confinement of prisoners results in cruel and unusual punishment depends not only on the size of the area in which they are confined, but also on the conditions attending their confinement in that area including sanitation, provision of security, protection against prisoner violence, and time and facilities available for work and exercise.

■ The provision of forty square feet per prisoner allows only a small distance between bunks. Under other conditions, a smaller dormitory area might not offend constitutional standards; but, under the conditions now prevailing in TDC units, the gauge fixed by the district judge appears to be within his discretion. As to it, the State has not satisfied its burden.

Having considered the authorities cited to us, including *Rhodes v. Chapman*, —— U.S. ——, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) and *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the injury to the State that will result if the forty-

| UNIT | NUMBER OF DORMITORIES | NO. OF INMATES IN DORMITORIES IN EXCESS OF CAPACITY OF 40 SQ. FT. | NO. OF TENTS | NO. OF INMATES IN ADMINISTRATIVE SEGREGATION |
|---|---|---|---|---|
| Darrington | 13 | 171 | 35 | 50 |
| Diagnostic | 1 | –0– | 10 | –0– |
| Eastham | 12 | –0–* | 35 | 10 |
| Ellis | 6 | 18 | 30 | 32 |
| Ferguson | 6 | 40 | –0– | –0– |
| Gatesville | 23 | –0– | –0– | 9 |
| Goree (Female prisoners) | 6 | 15 | –0– | 4 |
| Grimes Co. | 2 | 21 | –0– | –0– |
| Hilltop | 12 | –0–** | –0– | –0– |
| Huntsville | 12 | –0– | 6 | 17 |
| Jester I | 7 | 83 | 14 | –0– |
| Jester II | 5 | 42 | 7 | –0– |
| John Sealy (Hospital) | –0– | –0– | –0– | –0– |
| Mountain View (Female prisoners) | 15 | –0– | –0– | 7 |
| Ramsey I | 10 | –0– | 18 | 55 |
| Ramsey II | 15 | 38*** | 21 | 8 |
| Retrieve | 8 | 2 | 9 | 21 |
| Wynne | 11 | 20 | 24 | 45 |
| | | 641 | | 429 |

* 3 dormitories have 39 sq. ft. per inmate.

** 1 dormitory has 38 sq. ft. per inmate and 1 has 39 but several have 65 or more.

*** There would also be 3 dormitories with 39 sq. ft. per inmate.

As to those dormitories with 38 or 39 square feet per inmate, see the second-to-last paragraph of Part IIA of this opinion, Slip op. 825, p. 859 *infra.*

square-feet-per-prisoner provisions of Parts I(B)(2) and I(F) of the ·decree are not stayed, the injury to the prisoners if the stay is granted, and the public interest in awaiting a determination on the merits, we conclude that the State has not established that we should extend our stay of these provisions. Accordingly, we vacate the stay we granted pending our further orders and deny the motion to stay the forty-square-feet-per-prisoner provisions of Parts I(B)(2) and I(F) of the decree.

The forty-square-feet-per-prisoner requirement is not inexorable. De minimis variations, when on occasion in particular dormitories the prisoner population rises so that the space available is only 38 or 39 square feet, are permissible. The necessity for such temporary variations should be presented to the district court either immediately or from time to time as they occur.

However, because these provisions were to become effective on November 1, 1981, and, as a result of our issuance of a stay, that date has now passed, the State is granted sixty days from the date of issuance of this opinion to comply with these provisions of the decree.[9]

We have already heard argument of the case on the merits. Although the relief required by the sixty-square-feet-per-prisoner provisions of Parts I(B)(3)–(4), I(F), and VII(A)(4) of the decree is entirely prospective, planning for it would have to begin immediately if it is to be implemented fully by November, and commencing implementation of it will put a considerable immediate burden on TDC. However, we hope to reach a decision on the merits in this case well before November 1, 1982. Considering all of these factors, we grant the motion to stay the sixty-square-feet-per-prisoner provisions of Parts I(B)(3)–(4), I(F), and VII(A)(4) of the decree.

## B. Double-celling of Prisoners in Administrative Segregation

The district court's decree provides: "No prisoner shall be confined to adminis-

trative segregation with another prisoner in a cell containing sixty square feet·or less after August 1, 1981." Part IV(C)(3). Administrative segregation is not punitive, *Ruiz v. Estelle*, 503 F.Supp. at 1364, but is used, for example, to confine prisoners pending investigation of potential disciplinary charges against them, and to protect particular prisoners, *id.* at 1365. Whether the confinement of two prisoners to a cell is cruel and unusual punishment cannot be determined without considering conditions other than the amount of space in which the prisoners are confined, as we have already noted in our discussion of the dormitory space requirements.

The district court found that prisoners in administrative segregation "remain in their cells virtually twenty-four hours a day." *Id.* at 1364. This hardship has now been lessened by the period of at least one hour a day when, pursuant to Part IV(C)(1) of the decree, they are permitted to exercise. Yet many prisoners have been held in administrative segregation for months at a time. 503 F.Supp. at 1364. Although TDC policy now requires review of the status of each prisoner in administrative segregation after he has been confined there for thirty to forty-five days, *id.*, apparently this review seeks merely to determine whether the necessity for administrative confinement still exists, and does not result in the release to the general prison population of all prisoners in administrative segregation within forty-five days after they are placed in administrative segregation.

This provision of the decree became effective August 1, 1981, and was not stayed in *Ruiz I*. The State has declared that TDC is "presently in compliance with the administrative segregation and single celling requirement," and this is corroborated by the November 1981 TDC Housing Report, *supra* note 8. The effect of granting its motion to stay, therefore, would be not merely to stay the district court's decree but to reverse steps taken to implement it.

---

**9.** This grant of 60 days for compliance should obviate the State's fear of "fac[ing] the pros-

pect of a contempt citation at the same time this Court's order issues."

TDC rules, in specifying the conditions of administrative segregation, require that "[i]nsofar as possible, inmates will be placed in single cells." TDC Rule 4.3.3.5. However, TDC contends that some prisoners will deliberately defy rules and seek immediate administrative segregation as a reward if they know that they will thereby be confined to "a private room." The plaintiffs reply, with some logic, that TDC can limit the duration of administrative segregation and that prisoners who refuse to work can be punished for violation of prison rules. TDC's penal regulations, therefore, appear to provide an adequate control for prisoner abuse of administrative segregation.

For these reasons, our stay of Part IV(C)(3) of the decree is vacated and the motion to stay is denied.

### C. Prisoner-Uniformed Staff Ratio and Staff Deployment

The decree requires that, by November 1, 1981, TDC hire and train enough security staff officers to achieve a prisoner-uniformed staff ratio of less than 10:1. Part II(A)(1). The decree also requires that TDC achieve a prisoner-uniformed staff ratio of less than 8:1 by May 1, 1982, and less than 6:1 by November 1, 1982. *Id.* Finally, the decree requires that TDC maintain a specific staffing pattern, Part II(A)(2), and provides for changes in this pattern for a specific cell block or dormitory by application to the Special Master. Part II(A)(3).[10]

At the time of trial, the ratio of prisoners to uniformed staff in TDC was 12.45:1, which the district judge characterized as "one of the most unfavorable, if not the worst, staff/inmate ratios in the nation." 503 F.Supp. at 1290.[11] TDC has since received additional legislative appropriations

and now employs a staff large enough to make the prisoner-uniformed staff ratio 10.-4:1. Therefore, implementation of the provision of Part II(A)(1) of the decree fixing the prisoner-uniformed staff ratio to be achieved by November 1, 1981, is virtually accomplished.

In *Ruiz I,* we stayed the provisions of the decree that require single-celling of prisoners in general population cells,[12] relying in part on the remedial effects of the staffing provisions of the district court's decree. 650 F.2d at 569. The rationale for our stay of these single-celling provisions thus would be undermined if we eliminated the requirement that TDC hire and train additional uniformed employees to provide greater security.

How the additional employees should be deployed, however, involves other considerations. In denying the application for a stay of these provisions, the district court stated that the order for staff deployment patterns would not increase the number of uniformed employees per prisoner. TDC contends that this statement is incorrect, and so it appears to be. The twenty-two TDC units[13] have a certain number of cell blocks, tiers, and dormitories. If the ordered deployment patterns are followed, the number of uniformed employees on duty would be fixed. TDC contends that this would require one uniformed employee for every three or four prisoners, that is, a 3:1 or 4:1 prisoner-uniformed staff ratio.

Thus, TDC contends that the provisions of the decree fixing the deployment of staff appear to require the immediate hiring of a large number of additional uniformed employees. Neither the plaintiffs nor the intervenors have attempted to controvert this

---

**10.** In *Ruiz I,* we stayed Part II(A)(3) pending appeal. 650 F.2d at 575, 578.

**11.** In 1973, 1974, and 1977, TDC had what the district judge called "the worst staff/inmate ratio of any state prison in the United States." 503 F.Supp. at 1290.

**12.** The sizes of these cells vary from 40 to 66 square feet, with the "vast majority" measuring 45 square feet. *Id.* at 1277 n.7.

**13.** These consist of the 18 units listed in the district court's opinion, *id.* at 1274 n.1, plus, according to the November 1981 TDC Housing Report, *supra* note 8, four other units: Gatesville, Grimes County, Hilltop, and John Sealy (hospital).

contention. These provisions of the decree apparently are based on the assumption that, if TDC hires additional uniformed employees, their posting to provide the necessary additional security cannot be left to the judgment of TDC officials.

As to the provision of the decree pertaining to staff deployment, TDC has satisfied us of the likelihood of its success on the merits and has also met the other criteria for a stay. It has not, for the reasons already stated, convinced us that we should stay the provisions of the decree that require TDC to hire and train additional uniformed employees.

■ For these reasons, our stay of the provision of Part II(A)(1) that requires TDC to achieve a prisoner-uniformed staff ratio of less than 10:1 by November 1, 1981, is vacated and the motion to stay that provision is denied. In view of the delay caused by the stay proceedings, however, TDC is allowed sixty days from the date of this opinion to implement this provision. The motion to stay Part II(A)(2), pertaining to staff deployment, is granted.[14]

■ For the same reasons that we granted the motion to stay the November 1, 1982, and November 1, 1983, provisions pertaining to dormitory space, see p. 859, supra, we grant the motion to stay those provisions of Part II(A)(1) that require TDC to achieve a prisoner-uniformed staff ratio of less than 8:1 by May 1, 1982, and less than 6:1 by November 1, 1982.

### D. Use of Keys by Prisoners

Part II(D) of the decree requires the elimination of building tenders.[15] TDC asks us to stay only the provisions of Part II(D) that absolutely forbid prisoners, even when

they are properly supervised, to possess keys that lock and unlock doors in TDC units.

TDC contends that prisoner assistance in locking and unlocking doors materially assists the TDC staff, and that, if a stay is not granted, the staff will be required to perform this task, and its effective deployment will thereby be impeded. The plaintiffs do not controvert this contention. They do, however, contend that TDC has violated the district court's order pertaining to prisoners known as "turnkeys,"[16] and that TDC thus does not present itself with clean hands.

The extent of relief requested by TDC is limited. TDC is not asking us to stay other provisions of the decree pertaining to the use of prisoners for administration; it is mindful that Texas law provides: "An inmate in the custody of the Texas Department of Corrections or in any jail in this state may not act in a supervisory *or administrative* capacity over other inmates." Tex.Rev.Civ.Stat.Ann. art. 6184k–1 (Vernon Supp.1980) (emphasis added).

■ TDC has satisfied us that a stay of this provision of the decree pertaining to the use of prisoners to assist the TDC staff should be granted. Accordingly, we grant the motion to stay that provision of Part II(D) of the decree that forbids prisoners to possess keys even when they are properly supervised.

### III

In summary, it is ORDERED that the State's motion to stay Parts I(B)(2)–(4), I(F), II(A)(1)–(2), II(D), IV(C)(3), and VII(A)(4) of the district court's decree pending decision on the merits is GRANTED in the following respects:

---

14. Part II(A)(4) of the decree, which is not at issue in this appeal, incorporates the requirements of Parts II(A)(2)–(3). In *Ruiz I*, we stayed Part II(A)(3), see note 10 supra, and in this opinion we stay Part II(A)(2). Part II(A)(4), therefore, is stayed insofar as it incorporates Parts II(A)(2)–(3).

15. *See generally Ruiz v. Estelle*, 503 F.Supp. at 1294–98.

16. The officially approved duty of turnkeys is to "serve as adjuncts to civilian guards, opening doors only at the express directions of the officers." *Id.* at 1295 n.58.

(1) The provisions of Parts I(B)(3)–(4) and I(F) of the decree that require TDC to provide sixty square feet (excluding bathing, toilet, and activity areas) per prisoner in dormitories by November 1, 1982, and November 1, 1983, and the provision of Part VII(A)(4) that requires TDC to provide sixty square feet (excluding bathing, toilet, and activity areas) per prisoner in dormitories in new units, are stayed pending decision on the merits.

(2) The provisions of Part II(A)(1) of the decree that require TDC to achieve a prisoner-uniformed staff ratio of less than 8:1 by May 1, 1982, and less than 6:1 by November 1, 1982, are stayed pending decision on the merits.

(3) The provision of Part II(D) of the decree that forbids prisoners to possess keys, even when they are properly supervised, is stayed pending decision on the merits.

It is further ORDERED that the State shall have sixty days from the date this opinion is issued to comply with the following provisions of the district court's decree:

(1) The provisions of Parts I(B)(2) and I(F) of the decree that require TDC to provide forty square feet (excluding bathing, toilet, and activity areas) per prisoner in dormitories by November 1, 1981.

(2) The provision of Part II(A)(1) of the decree that requires TDC to achieve a prisoner-uniformed staff ratio of less than 10:1 by November 1, 1981.

The State having failed to make the required showing to warrant a stay of other provisions of the decree, it is ORDERED that the State's second motion to stay the district court's decree is in all other respects DENIED.

## IV

Although this action is taken by the panel that has heard argument on the merits, it is not a blueprint of things to come. Our judgment on the merits is reserved until we can study both the complex legal issues and the evidentiary appendix that, despite the best efforts of counsel, is still voluminous.

Prisoners are not shaved of constitutional rights when the gate is locked behind them. The very purpose of the fourteenth amendment is to render the states and their institutions obedient to the Federal Constitution. Yet "conditions [that] are restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. at 347, 101 S.Ct. at 2399, 69 L.Ed.2d at 69. We have not overlooked these principles in acting on this second motion to stay, but the nature of interim proceedings like this one prevents us from making final determinations when acting on interlocutory matters.

## APPENDIX

Because the district court's decree is so frequently referred to in *Ruiz I* and in this opinion and will also be referred to in our opinion on the merits, we set forth its full text.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DAVID RUIZ, ET AL.,<br>    Plaintiffs, | ) | |
| UNITED STATES OF AMERICA,<br>    Plaintiff-Intervenor, | ) | NO. H–78–987–CA |
| V. | | |
| W. J. ESTELLE, JR., ET AL.,<br>    Defendants. | ) | |

## AMENDED DECREE GRANTING EQUITABLE RELIEF AND DECLARATORY JUDGMENT

JUSTICE, Chief Judge.

Upon the bases set out in the court's memorandum opinion filed on December 12, 1980, and the supplemental memorandum opinion filed on April 20, 1981, it is hereby ORDERED, ADJUDGED, and DECREED, as follows:

Defendants, their successors, officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them (referred to collectively as "defendants") are hereby ENJOINED as follows:

### I. OVERCROWDING

#### A. *Reduction of Population*

1. Defendants shall forthwith employ all measures within their power to reduce the total population of prisoners in facilities operated by TDC, as well as the prisoner population at each prison unit. At a minimum this shall include:

   a. The elimination of any practice or procedure that unreasonably inhibits or delays the award or restoration of good time to prisoners;

   b. the elimination of any practice or procedure that unreasonably inhibits or delays the granting of parole;

   c. the expansion of the work furlough program pursuant to Section 6166x–3, V.A.T.S.; and

   d. the expansion of the prisoner furlough program pursuant to Section 6184n(2), V.A.T.S.

2. Defendants shall, by November 1, 1981, review the record of every prisoner not having credit for SAT III good time (thirty days overtime for each month served) for the entire period he has served in TDC, and consider whether such prisoner should be credited with some part or all of such good time.

3. Defendants shall, by November 1, 1981, review the record of every prisoner who would be eligible for parole interview except for the absence of sufficient "PIP" incentive points, and consider whether such prisoner should be credited with sufficient points to be eligible for parole interview.

4. In expanding their work furlough program, defendants shall forthwith make maximum use of their authority under Section 6166x–3, V.A.T.S., to house prisoners outside of TDC units. Specifically: by November 1, 1981, defendants shall have at least 300 prisoners on work furlough; by May 1, 1982, defendants shall have at least 1,200 prisoners on work furlough; by November 1, 1982, and thereafter until further order of the court, defendants shall at all times have at least 2,500 prisoners on work furlough.

5. In expanding the prisoner furlough program, defendants shall make maximum use of Section 6184n(2)(a), V.A.T.S. Specifically: by November 1, 1981, defendants shall have at least 300 prisoners on furlough; by May 1, 1982, defendants shall have at least 600 prisoners on furlough; by November 1, 1982, and thereafter until further order of the court, defendants shall at all times have at least 1,000 prisoners on furlough.

6. Defendants shall expand TDC's role in community corrections and establish minimum security institutions, honor farms or units, halfway houses, urban work or educational release centers, community treatment centers, and the like. These facilities shall be located in areas near population centers of sufficient size to provide services. By November 1, 1981, defendants shall file with the court a plan for the establishment by TDC of such facilities with or without the participation of other state or local agencies.

#### B. *Maximum Population*

1. By May 1, 1981, and on the first day of every third month thereafter, defendants shall file with the Court a report stating for each unit:

   (a)(i) the number and size in square feet of cells housing general population prisoners;

(ii) for each size category of general population cells (*i.e.*, 45 sq. ft., 60 sq. ft.), the number of prisoners who are (A) single-celled, (B) double-celled, (C) triple-celled, (D) housed four to a cell, etc.

(b)(i)(A) the number of dormitories housing general population prisoners, (B) the total floor space of each dormitory in square feet, *including* bathing, toilet, and activity areas, and (C) the total floor space of each dormitory in square feet, *excluding* bathing, toilet, and activity areas;

(ii) the number of prisoners housed in each dormitory, and the number of square feet per prisoner in each dormitory, *excluding* bathing, toilet and activity areas.

(c)(i) the number, size in square feet, type (cell or dormitory) and use (*e.g.*, administrative, punitive segregation or medical segregation) of all other housing accommodations;

(ii) for each size, type, and use category of such other housing accommodations, the number of prisoners housed therein.

2. If, by November 1, 1981, defendants have not been able to reduce overall TDC population to a figure equal to twice the number of general population cells, plus the number of prisoners who can be housed in dormitories that afford forty square feet (excluding bathing, toilet and activity areas) per prisoner, they shall not, until further order of the Court, accept any further prisoners for confinement until the population falls below such figure. After the population falls below such figure, defendants shall not, until further order of the court, accept any prisoner whose confinement would cause the population to exceed such figure.

3. By November 1, 1982, defendants shall reduce overall TDC population to a figure equal to 1.5 times the number of general population cells, plus the number of persons who can be housed in dormitories that afford sixty square feet (excluding bathing, toilet and activity areas) per pris-

oner. Defendants shall not thereafter, until further order of the court, accept any prisoner whose confinement would cause the population to exceed such figure.

4. By November 1, 1983, defendants shall reduce overall TDC population to the number of general population cells, plus the number of persons who can be housed in dormitories that afford sixty square feet (excluding bathing, toilet and activity areas) per prisoner. Defendants shall not thereafter, until further order of the court, accept any prisoners whose confinement would cause the population to exceed such figure.

### C. *Quadruple Celling*

By May 1, 1981, no prisoner shall be confined with more than two other prisoners in any cell.

### D. *Triple Celling*

By August 1, 1981, defendants shall not confine any prisoner with more than one other prisoner in any cell. Until triple-celling has been eliminated, no prisoner may be confined in any cell with more than one other prisoner for more than ten days during any thirty-day period.

### E. *Double Celling*

By August 1, 1982, no more than fifty percent of the TDC population housed in cells shall be assigned to cells of sixty square feet or less holding two prisoners. By August 1, 1983, no prisoner shall be assigned with another prisoner to a cell containing sixty square feet or less.

### F. *Dormitories*

By November 1, 1981, and thereafter until further order of the court, defendants shall not confine any prisoner to a dormitory providing less than forty square feet per prisoner. By November 1, 1982, and thereafter until further order of the court, defendants shall not confine any prisoner to a dormitory providing less than sixty square feet per prisoner. Permissible square footage in dormitories excludes area used pri-

marily for bathing, toilet or recreation ("day room") activities.

## II. SECURITY AND SAFETY

### A. *Security Staff*

1. Defendants shall employ sufficient trained staff, taking account of the security levels of the TDC prison population and the design of TDC facilities, to provide for the security, control, custody and supervision of prisoners. Specifically, by November 1, 1981, defendants shall have hired and trained sufficient security staff officers so that the TDC staff-prisoner ratio exceeds one uniformed staff member for every ten prisoners. By May 1, 1982, defendants shall have hired and trained sufficient security staff so that such ratio exceeds one uniformed staff member for every eight prisoners. By November 1, 1982, defendants shall have hired and trained sufficient security staff so that such ratio exceeds one uniformed staff member for every six prisoners, and thereafter, until further order of the court, defendants shall maintain such ratio.

2. In all TDC units or housing areas to which maximum security prisoners are assigned, the defendants shall, by November 1, 1982, maintain the following minimal staffing pattern:

(a) at least one officer shall be assigned to each tier of every cellblock at all times when any cell in the tier contains more than one prisoner.

(b) at least one officer shall be assigned to remain in each dormitory at all times when more than two but less than forty prisoners are situated therein.

(c) at least two officers shall be assigned to remain in each dormitory at all times when more than forty prisoners are situated therein.

(d) for each dormitory in which an officer is posted, an officer situated at some outside point shall have some form of contact (*e.g.*, voice communication, beeper, visual observation) with the officer on the inside, in order that additional staff may respond rapidly to any difficulties which may occur inside the dormitory.

3. If the defendants are of the opinion that the minimal staffing pattern described in II–A–2 above is unnecessary to the protection of inmates as to a specific cellblock or dormitory, they may file a report with the Special Master delineating their contentions as to why the prescribed staffing pattern is unnecessary in the particular instance. If the Special Master, after allowing time for objections from the other parties, agrees with the defendants in a particular instance, relief from part II–A–2 of this order may be effected, provided defendants comply with any alternate staffing pattern that may be prescribed by the Special Master. However, if any party desires to appeal from a decision of the Special Master under this section, such appeal may be made to the court, but only on the basis of the record made before the Special Master. In the event of such an appeal from a decision of the Special Master authorizing particularized relief from Part II–A–2 hereof, the decision shall not take effect pending review by the court.

4. The TDC staff-prisoner ratio and officer assignments prescribed above shall be maintained until such time as the defendants can demonstrate to the court that they can fulfill their constitutional responsibilities by employing a different staff-prisoner ratio and/or officer assignments.

### B. *Staff Training*

By August 1, 1981, defendants shall file with the court a plan and timetable for the training of new security officers and the retraining of existing security officers. The training shall include adequate attention to the use of force and chemical agents as well as to the requirements of the court's memorandum opinion of December 12, 1980, this decree, the consent decree agreed to by the parties, and any further orders in this action.

### C. *Use of Physical Force*

1. By June 1, 1981, defendants shall develop and file with the court clear and

concise written standards governing the use of force by TDC personnel against prisoners. The standards shall ensure that only the minimum force reasonably believed to be necessary shall be used, and then solely in the following situations:

(a) In cases of self-defense against a prisoner, where the physical safety of a TDC officer or employee is imminently and immediately threatened;

(b) Where the conduct of a prisoner presents an imminent and immediate threat to the physical safety of another person or persons;

(c) In the prevention of serious damage to property by an inmate, where the danger to property presents an imminent and immediate threat;

(d) In the prevention of escapes;

(e) In maintaining or regaining control of a prison institution or any portion or facility therein (including any open fields or areas where inmates are employed), in the event of a mutiny, rebellion, riot, or disturbance. Authorization for the use of force to quell a mutiny, rebellion, riot, or disturbance shall be made only by the assistant warden or higher authority, except in case of a bona fide emergency where the officer in charge must take necessary action without delay; and

(f) In enforcement of prison rules and regulations in order to temporarily isolate or otherwise confine a prisoner, where lesser means have proven ineffective.

2. Any use of force must be documented in writing and submitted to the appropriate warden, a copy of which shall be sent to the Director of TDC and to the Special Master.

3. Any TDC employee who violates these standards shall be promptly and effectively disciplined. A report of any such violation and the discipline imposed shall be maintained and available for review on request by the Special Master and/or counsel.

4. All reasonable steps shall be taken to reduce and prevent any incident or necessity for the use of force.

5. Unless deadly force is immediately necessary to prevent serious injury to any person or to prevent escape, only nondeadly force shall be used.

6. Deadly force may also be used when necessary to quell a mutiny, rebellion, riot, or disturbance in which loss of life or serious injury to any person or escape is imminent, and where lesser means have failed to achieve the purpose of quelling such mutiny, rebellion, riot, disturbance, or escape.

7. In no event shall force be used to impose discipline. Disciplinary sanctions for the violation of a prison regulation or rule will be imposed only pursuant to such procedures as are now or in the future may be established for the conduct of disciplinary proceedings.

8. Mechanical instruments of physical restraint, not more confining than required by the circumstances, shall be used only: (a) as a precaution against escape during the transfer of prisoners; (b) to prevent injury to others or serious property damage; and (c) for medical reasons or for prevention of self injury, and then, except in emergencies, only at the direction of a physician. In the case of emergencies, a physician's directions shall be obtained as early as practicable. Prisoners in such restraints shall be closely supervised. Restraints shall not be used as disciplinary or punishment measures.

9. Security and custodial personnel shall use only those types of weapons, instruments of restraint, chemical agents, or similar technology that have been approved personally by the Director of TDC.

### D. *Elimination of Building Tenders*

No prisoner or group of prisoners shall have administrative or supervisory authority over other prisoners or be placed in a position to administer disciplinary action. The defendants shall forthwith eliminate the building tender system. Specifically, defendants shall abolish the jobs of "building tenders," "hall tenders," "orderlies," "floor boys," "turnkeys," "key girls," "porters," "bookkeepers," "count boys," "field

porters," "water boys," "lead row workers" and "tail row workers". No prisoner shall be placed in a position to exercise administrative or supervisory authority over another prisoner, to assist in counting other prisoners, to possess keys or weapons, to escort prisoners to different areas of the unit, to provide access to areas of the unit, to influence cell assignments, or to have access to another prisoner's medical or institutional records.

1. If prisoners are assigned duties heretofore performed by building tenders (including distribution of correspondence, commissary script or goods, operation of television sets, and other day room games or activities, keeping track of the whereabouts of other prisoners, and performing janitorial services), such duties shall be rotated at least every thirty days, consistent with classification requirements, so that prisoners in a housing unit have the opportunity to share these duties (and the accompanying perquisites of open cells, flexible meal hours and the like). The duties relating to each assignment (which shall be consistent with classification standards to be developed) shall be written and posted in a conspicuous manner in the area where the duties are to be performed. A roster of prisoners assigned these duties and the term of service shall be maintained at each unit. Prisoners who violate or exercise authority beyond the posted duties shall be subjected to disciplinary action.

2. The defendants shall promptly investigate all allegations that prisoners are functioning as building tenders and are exercising control or authority over other prisoners. The results of such investigations, along with statements and copies of records obtained, shall be available for review on request by the Special Master and/or counsel.

E. *Classification*

So long as defendants confine more than one prisoner to a cell of sixty square feet or less, or to a dormitory, they shall maintain a classification system assuring that abuses of prisoners by those they live with will be minimized. By August 1, 1981, defendants shall file a plan with the court setting forth an adequate classification system and a timetable for its implementation. The plan will include provisions to insure that in the future only minimum security prisoners are assigned to live in dormitories.

### III. HEALTH CARE.

In addition to the provisions of the Consent Decree agreed to by the parties, the Huntsville Unit Hospital shall, by November 1, 1981, be downgraded to use as the Unit infirmary and shall not be used for care of prisoners from other units, unless, by November 1, 1981, it can be brought into compliance with the standards of the Texas Hospital Association or the Joint Commission on Accreditation of Hospitals. Otherwise, defendants shall, by November 1, 1981, provide for adequate hospital facilities, staffed, equipped and operated in accordance with Texas Hospital Association or Joint Commission on Accreditation of Hospitals Standards, for the care of the TDC population, and shall report to the Court, by August 1, 1981, their plans for doing so.

### IV. DISCIPLINE.

A. *Practices and Procedures*

Defendants shall forthwith conform their disciplinary practices to the requirements of *Wolff v. McDonnell*, 418 U.S. 539 [94 S.Ct. 2963, 41 L.Ed.2d 935] (1974), for proceedings in which prisoners might be subjected to solitary confinement, loss of good time or demotion in time-earning class. To assure that *Wolff* and due process requirements are in fact observed:

1. Defendants shall institute systematic means of informing all prisoners, including those who do not speak English, of all operative disciplinary rules, whether they are unit rules or systemwide TDC rules. All disciplinary rules for which a prisoner may be punished must be in written form and must be adequately distributed or posted.

2. At the time of service of disciplinary charges, defendants shall provide the ac-

cused prisoner with the Offense Report or with substantially the same information contained in the Offense Report filed by the charging officer. Items of information which, if disclosed to the accused prisoner, would seriously jeopardize the safety of other inmates, need not be provided to the accused prisoner.

3. Defendants may not confine prisoners to administrative segregation pending a disciplinary hearing without first ascertaining whether administrative segregation is in fact necessary to safeguard institutional security (including the protection of other inmates or staff members), detailing in writing the reasons for administrative segregation, and insuring that prisoners are provided means, through counsel substitute or otherwise, to gather evidence and prepare their defense in anticipation of the disciplinary hearing. A prisoner segregated pending a disciplinary hearing shall, whenever possible, be given the hearing within three days. If the prisoner is not given a hearing in three days, the reasons therefor shall be set forth in the record of the hearing. In any event, a prisoner segregated pending a disciplinary hearing shall be given the hearing within ten days. Credit for time served in prehearing detention shall be considered by the disciplinary committee assessing a penalty in the event the prisoner is determined guilty of the charged infraction.

4. Defendants may not subject prisoners faced with disciplinary charges to any form of coercion designed to persuade them to waive their rights to a 24-hour notice prior to the disciplinary hearing. If prisoners are offered the opportunity to waive 24-hour notice, they must be fully informed, in terms intelligible to them, of the nature of the rights at stake.

5. Records of disciplinary hearings in which the result is unfavorable to the accused must be maintained, and must set out the evidence presented and considered at the hearing. The records must explain the reasons in each individual case for the determination of guilt and the particular punishment imposed. The accused prisoners shall be given copies of the records at the time they are informed of the committee's decision, or shortly thereafter. Copies of such records must be placed in the individual inmate's file.

6. TDC officials shall inform accused prisoners of their general right to present documentary evidence and call witnesses, at the time they are served with notice of the charges. Prisoners must be allowed, either personally or through counsel substitute, to communicate with a reasonable number of potential witnesses in advance of the disciplinary hearing. Witnesses requested by the prisoner must be permitted to testify, unless legitimate institutional needs dictate otherwise. Such needs shall be fully documented in the record.

7. Before proceeding with a disciplinary hearing, the committee must make a reasoned determination whether accused prisoners are in need of a counsel substitute. Any prisoner (a) whose literacy, mental abilities or misunderstanding of English is questionable; (b) who, because of the complexity of the issue, will be unlikely to be able to collect and present the evidence necessary for an adequate comprehension of the case; or (c) who is confined to any form of segregation pending the hearing, must be provided with counsel substitute. Defendants shall maintain a panel of TDC staff members, on a rotating basis, from which prisoners may choose counsel substitute. However, at the discretion of the disciplinary committee, the accused may be allowed to choose counsel substitute from among his fellow inmates, if he so desires. Counsel substitute must be given time and the means to confer with the accused prisoner and with potential witnesses, and to obtain documentary evidence, in order to provide adequate representation at the hearing.

8. No disciplinary committee may include an officer who has filed the charges, ordered the filing of the charges, or participated in any incident that led to the charges in question.

9. Prisoners charged with rule violations shall be present at disciplinary hearings un-

less their behavior during the hearing justifies their exclusion. If a prisoner refuses, or is unable, to appear at the hearing, the hearing may be conducted in the prisoner's absence. Prisoners may hear all evidence presented at the hearing, unless hearing the evidence will jeopardize the life or safety of the persons or the security and order of the institution. The record must establish and provide justification for the accused prisoner's absence during any portion of the hearing.

10. At a disciplinary hearing an accused prisoner may make statements, call witnesses (unless the testimony of such witness is likely to jeopardize the life or safety of persons or the security and order of the institution), and present documentary evidence. The prisoner, or his counsel substitute, may question all witnesses. If security considerations require that the accused prisoner be removed from the hearing for the presentation of any evidence or questioning of any witness, the prisoner's counsel substitute shall be permitted to remain and to act in the prisoner's behalf, unless the counsel substitute is an inmate whose hearing of the evidence will jeopardize the life or safety of persons or the security and order of the institution. The record must establish and provide justification for the exclusion of the prisoner counsel substitute, and such record shall be made available to the Special Master.

11. Defendants shall follow their own rules and regulations governing disciplinary procedures.

B. *Recording of Disciplinary Hearings*

All disciplinary hearings, until further order of the court, must be recorded by tape recorder or other means of preserving a verbatim record of the proceedings. The tape recording or other record of the hearing shall be preserved for at least one year after the hearing. A prisoner, or his counsel substitute, may have access to the tape recording or other record in connection with any litigation in which the disciplinary proceeding may be relevant, or for other purposes for which the prisoner can show a reasonable need. Only that portion of the tape recording or other record for which the prisoner was excluded from the hearing for security reasons may be excepted from the prisoner's review. Such tape recordings or other records shall be available for review upon request of the Special Master and/or counsel. At the request of a prisoner, the tape will be made available to the reviewing authority, in the event of any appeal for a disciplinary proceeding or in instances where a grievance is filed as a result of such proceeding.

C. *Administrative Segregation*

1. Defendants shall not confine any prisoner to administrative segregation without opportunity for regular outdoor exercise, if the prisoner is confined for longer than three days. Segregated prisoners must be allowed to leave their cells at least once a day for physical recreation of at least an hour's duration, unless, in an individual case, fulfillment of the requirement would create an immediate and serious threat to prison security. By November 1, 1981, defendants shall file with the court a plan providing for increased and regular out-of-cell recreation opportunities for prisoners segregated on Death Row.

2. No prisoner shall be confined to administrative segregation with more than one other prisoner in a cell containing sixty square feet or less after May 15, 1981.

3. No prisoner shall be confined to administrative segregation with another prisoner in a cell containing sixty square feet or less after August 1, 1981.

D. *Vague Rules—Declaratory Judgment*

The following TDC rules are declared to be unconstitutionally vague: Rule 3.11–F to the extent that it prohibits "general agitation"; Rule 3.11–G to the extent that it prohibits "agitating"; Rule 3.11–H to the extent that it prohibits "laziness"; Rule 3.11–O to the extent that it prohibits "engaging in unauthorized activities"; and Rule 3.11–P to the extent that it prohibits "disrespectful attitude or actions."

## V. ACCESS TO COURTS, COUNSEL AND PUBLIC OFFICIALS

A. The defendants' written policy statements, rules, and regulations and practices shall ensure that prisoners committed to their care, custody, and control have access to state and federal courts, and to legal counsel and public officials. Prisoners shall have the right and shall be afforded the opportunity to present any issue, including challenges to the legality of their conviction or confinement, redress for improper conditions of confinement, pursuing remedies in connection with civil legal problems, and asserting, against correctional officials or other governmental authority, any other rights protected by constitutional or statutory provision, or by common law.

B. Defendants shall not interfere with, harass, punish, or otherwise penalize any prisoner as a result of participation in litigation, either as a party or a witness, or for filing or threatening to file a lawsuit, grievance, appeal, or other complaint about prison conditions or official misconduct, or for discussing with others or writing to others about actual or potential legal actions or other forms of grievance and complaint.

C. Defendants shall not interfere with the right of prisoners to have access to attorneys and their authorized representatives, including paralegals, law students, investigators, or other assistants to counsel.

D. Mail addressed by any prisoner to an attorney, a court, or a public official, and mail addressed from such persons to any prisoner, may not be read by defendants or any TDC employee. Outgoing mail from prisoners to such persons may be sealed; incoming mail from such persons may be inspected only for physical contraband, and only in the presence of the prisoner.

E. Defendants shall maintain appropriate facilities for confidential interviews between prisoners and their attorneys or authorized representatives. At a minimum, defendants shall provide for:

1. Private and confidential conferences between prisoners and their attorneys or their authorized representatives, with no auditory monitoring;

2. Consultation areas which permit the direct and confidential exchange of documents and other papers;

3. Authorization for attorneys or their authorized representatives to meet with more than one client, witness, prospective witness or other prisoners at the same time, subject to reasonable regulation of the time, place, and number of participants, with no auditory monitoring.

4. The recording of interviews, should they so desire, by attorneys or their authorized representatives. The recording device may be searched for contraband.

F. Defendants shall provide prisoners with reasonable access to notary public services. Notaries and TDC employees shall not be permitted to approve, disapprove, or to read prisoners' legal materials beyond that review necessary for the identification of the document. Prisoners shall not be required to surrender their documents as a condition of obtaining notarization.

G. Prisoners shall have access to and use of an appropriate and adequate law library, as well as to supplies and services necessary to the processing of their legal matters. If the law library becomes overcrowded, the defendants shall increase the space used for legal study, consultation, and the preparation of legal materials, by permitting prisoners to use classrooms and other educational facilities for this purpose at times that such facilities are not being used.

H. Defendants shall permit prisoners to retain a reasonable amount of legal papers, legal correspondence, law books, legal notes, and other legal materials in their cells or dormitories or, at the prisoners' election, in the unit writ room or in some other secure place provided by defendants. Such legal materials shall not be considered "contraband" and prisoners shall not be punished for possessing legal materials. Prisoners shall be permitted to have regular daily access to their legal materials and to facilities for legal study or consultation. They

shall be permitted to do legal work in their cells, in the unit writ room (law library), or other appropriate place designated by defendants. As a condition of using the writ room, prisoners may not be subjected to strip searches unless defendants have reasonable cause to believe that a specific prisoner is in possession of contraband.

I. Defendants shall provide prisoners in segregated status (administrative, disciplinary or medical) with reasonable access to legal materials and services and provide them with an opportunity to communicate with counsel by mail or by in-prison confidential interviews, with no auditory monitoring.

J. Defendants shall permit prisoners to assist other prisoners with the preparation of legal matters, subject to reasonable regulation of the time, place, and manner of such assistance. Prisoners housed in the same unit shall be permitted to confer in person as frequently as is reasonably needed, subject to reasonable security considerations, without undue restriction as to time or place. Prisoners housed on different units may communicate in writing, subject to having their correspondence read by the defendants.

K. By November 1, 1981, the defendants shall report to the court the manner in which they provide TDC prisoners with access to courts and public officials. The report shall include copies of applicable regulations, rules, instructions, and policy statements, and must also provide a description of the services offered, the staff assigned, and the facilities available at the various TDC units.

## VI. OTHER CONDITIONS OF CONFINEMENT

### A. *Fire Safety*

Defendants shall forthwith develop specific fire safety regulations, and evacuation plans, construct adequate fire exits to ensure the safety of prisoners and staff, and otherwise comply with the current edition of the Life Safety Code of the National Fire Protection Association. Defendants shall file a report with the court by November 1, 1981, stating the measures taken or planned, together with timetables for completion, which will assure compliance with the applicable provisions of the Life Safety Code. Every TDC unit shall be in compliance with the fire safety standards, and no prisoner may be confined in any unit, or assigned to a work or program activity area that is not in compliance, by May 1, 1982. In addition, the report shall specifically address and provide for:

1. The inspection of all TDC facilities on a regular basis by an independent qualified fire safety officer to assess compliance with fire and safety standards and a weekly fire and safety inspection by a staff member or TDC employee.

2. The prompt release of prisoners from locked areas in case of emergency.

3. An assessment of fire fighting plans, procedures, and equipment on hand or readily available.

4. An evacuation corridor between rows of beds in dormitory housing, which shall be at least four feet wide.

### B. *State Health and Safety Laws*

1. Defendants shall comply with the requirements of the following state statutes: the Texas Food, Drug and Cosmetic Act, Tex.Rev.Civ.Stat. Ann. Art. 4476–5 (Vernon's 1976) (canneries, meat processing plants, dairies, dining halls and food preparation areas); Tex.Rev.Civ.Stat. Ann. Art. 4476–10 (food service and processing employees and prisoners working in such activities); the Texas Meat and Poultry Inspection Act, Tex.Rev.Civ.Stat. Ann. Art. 4476–7, Section 10 (meat and poultry operations); Tex.Rev.Civ.Stat. Ann. Art. 165–8, Section 7 (egg-handling operations); Tex.Rev.Civ. Stat. Ann. Art. 165–3 (milk production); Tex.Rev.Civ.Stat. Ann. Art. 5173 (mill, workshop, factory, laundry and other industrial operations); Tex.Rev.Civ.Stat. Ann. Art. 5192(a) (industrial and agricultural operations).

2. By November 1, 1981, defendants shall file with the court a plan for regular

and adequate inspections of all TDC facilities by independent and qualified inspectors of defendants' compliance with the statutes listed above.

VII.   NEW FACILITIES

A.   Defendants shall not make final selection of a site for, nor undertake the construction of any new units for housing prisoners unless they have filed a report with the court demonstrating that the following conditions are met:

1.   The population of the unit will not exceed 500 prisoners, or the unit will be so structured that the population of each organizational sub-unit within the unit will not exceed 500 prisoners, in accordance with Section VIII of this order.

2.   The unit will not be located more than fifty miles from a Standard Metropolitan Statistical Area (SMSA), as defined by the United States Bureau of the Census, with a population exceeding 200,000, unless defendants' report shows that defendants are able to recruit and maintain adequate numbers of qualified professionals, paraprofessionals, and others in all disciplines necessary to the effective functioning of the unit in a constitutional manner.

3.   All prisoners classified as maximum security prisoners in accordance with the classification plan to be submitted pursuant to Section II–E of this order will be confined to single cells of at least sixty square feet.

4.   All prisoners classified as minimum security prisoners in accordance with the classification plan to be submitted pursuant to Section II–E of this order will be confined to single cells of at least sixty square feet or in dormitories providing at least sixty square feet per prisoner, excluding bathing, toilet, and recreation ("dayroom") areas.

5.   The facility will comply with the fire safety standards of the current edition of the Life Safety Code of the National Fire Protection Association.

B.   By August 1, 1981, defendants shall file a report with the court providing the information required above for the Beto Unit (now under construction) and the proposed Grimes County unit.

C.   Defendants shall not undertake the construction of any new facilities or cellblocks for housing prisoners on existing units, unless they have filed a report with the court demonstrating that the following conditions are met:

1.   All prisoners classified as maximum security prisoners in accordance with the classification plan to be submitted pursuant to Section II–E of this order will be confined to single cells of at least sixty square feet.

2.   All prisoners classified as minimum security prisoners in accordance with the classification plan to be submitted pursuant to Section II–E of this order will be confined to single cells of at least sixty square feet or in dormitories providing at least sixty square feet per prisoner, excluding bathing, toilet, and recreation ("dayroom") areas.

3.   Defendants are able to recruit and maintain adequate numbers of qualified professionals, paraprofessionals, and others in all disciplines necessary to the effective functioning of the entire unit in a constitutional manner.

4.   The facility or cellblock will comply with the fire safety standards of the current edition of the Life Safety Code of the National Fire Protection Association.

5.   The addition of the facility or cellblock will not impede the defendants' compliance with Section VIII of this order relating to reorganization of existing TDC units.

VIII.   MANAGERIAL   REORGANIZATION OF TDC CORRECTIONAL FACILITIES

Defendants shall submit a plan to the court providing for the reorganization and decentralization of the management of each TDC unit housing more than 500 prisoners. The plan shall assure that the units are subdivided into units of no more than 500, that the warden of any unit is responsible

for no more than 500 prisoners, that each organizational component of the unit is administratively and programmatically decentralized with its own manageable supervisory structure, and that the architectural modifications and retrofitting necessary to create the sub-units and their reorganization will be completed before November 1, 1982. This plan shall be submitted by November 1, 1981.

## IX. REPORTING

A. All of the reports and plans required by this decree and the consent decree agreed to by the parties shall be filed with the Clerk of the court and served on opposing parties and the Special Master by the dates indicated. If opposing parties have any objection to the adequacy or contents of any report or plan, they may file such objections with the court within thirty days after receiving such report or plan. The court may determine to hold a hearing or to direct the Special Master to hold a hearing, on any such objections.

B. Until the further order of the court, defendants shall promptly provide the Special Master with copies of the disciplinary records required pursuant to Section IV–A–5 above, together with any appeals taken by prisoners from disciplinary decisions and, upon the Special Master's request, tapes or other verbatim records of the disciplinary hearings.

C. Until the further order of the court, defendants shall promptly provide the Special Master with reports of physical examinations of prisoners entering solitary confinement and reports of their physical and mental health while so confined, showing compliance with TDC Rules 4.3.4.2.4 and 4.3.4.2.7.

D. Until the further order of the court, defendants shall promptly provide the Special Master with copies of the reports on uses of force and chemical agents required pursuant to the consent decree and Section II–C–2, above.

\* Former Fifth Circuit case, Section 9(1) of Public

## X. COUNSEL FEES AND COSTS

The class plaintiffs are entitled to recover from defendants their counsel's reasonable fees and costs, pursuant to 42 U.S.C. Section 1988. Plaintiffs' counsel and defendants' counsel are directed to endeavor to agree on the amount thereof. If they are unable to agree, plaintiffs may submit an appropriate motion to the court, and the court will fix the amount of fees and costs. Plaintiffs may file later applications for services rendered by their counsel in implementing the relief specified in this decree and the consent decree agreed to by the parties, and for further services in this action.

SIGNED and ENTERED this 1st day of May, 1981.