## In re BEDFORD SPRINGS HOTEL, INC., Debtor.

### Bankruptcy No. 88–0589.

United States Bankruptcy Court, W.D. Pennsylvania.

March 23, 1989.

See also, Bkrtcy., 99 B.R. 302.

Joseph E. Schmitt, Trustee, Stonecipher, Cunningham, Beard & Schmitt, Pittsburgh, Pa., Leonard F. Spagnolo, Thorp, Reed & Armstrong, Pittsburgh, Pa., William A. Duerk, Ross & Duerk, Washington, D.C., for F. Bruce Corneal, Jr.

Eric A. Schaffer, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., Emil Hirsch, Thomas, Hirsch & Albert, Washington, D.C., for Asher J. Sky.

David K. Rudov, Rudov & Stein, Pittsburgh, Pa., for Creditors' Committee.

Gary Philip Nelson, Buchanan Ingersoll, P.C., Pittsburgh, Pa., for Union Nat. Bank.

Stephen I. Goldring, Asst. U.S. Trustee, Pittsburgh, Pa.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Before the Court is F. Bruce Corneal, Jr.'s ("Corneal") *Motion For Stay Pending Appeal,* wherein Corneal implores this Court to stay our Order of January 25, 1989 confirming the Plan of Reorganization of Asher J. Sky ("Sky"). Objections to the request for stay were filed by Sky, the Chapter 11 Trustee, and Union National Bank ("UNB"), the primary secured creditor in the case.

To describe the present status of the Sky/Corneal relationship as acrimonious would be a serious understatement. These two men began as partners to renovate and revitalize a grand old hotel with historical importance to the entire community. A difference of opinion has swelled to the point where the two are unable to agree on the day of the week. The two men sought creditor support for competing plans of reorganization. The creditors voted overwhelmingly in favor of the Sky Plan, and by obvious, necessary inference, against the Corneal Plan. Thereafter the instant brouhaha commenced, and continues.

On January 25, 1989, after a full day of testimony, this Court entered an Order confirming the Sky Plan. Corneal filed a notice of appeal on February 2, 1989 and this *Motion For Stay Pending Appeal* the following day. It took twelve (12) days from January 25, 1989, the date of Plan Confirmation, for Corneal to file his Motion For Expedited Hearing on the Motion For Stay. This Court set such a hearing for March 17, 1989, as same was the first available

date on this Court's calendar. Corneal was dissatisfied with such a delay, and chose to file the stay motion directly with the District Court. The original District Court judge set a hearing for March 1, 1989, but found it necessary to recuse himself one day prior thereto. On March 2, 1989, the District Court set a hearing for March 6, 1989. That hearing was conducted, after which the District Court stayed the Order of the Bankruptcy Court, pending hearing of March 17, 1989 and subsequent decision thereon.

The standard for ascertaining the propriety of a stay, like that governing grants of preliminary objections, contains four (4) elements:

(1) a strong showing of probable success on appeal;

(2) the prospect of irreparable harm if relief is not granted;

(3) the possibility of substantial harm to other interested persons; and

(4) the public interest.

*Hilton v. Braunskill,* 481 U.S. 770, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987); *Hoots v. Commonwealth of Pennsylvania,* 651 F.2d 177 (3rd Cir.1981); *Gusdonovich v. Business Information Co.,* 119 F.R.D. 15 (W.D.Pa.1987). Movant bears the burden to show justification for the stay. *Gusdonovich, supra. See also, Ruiz v. Estelle,* 666 F.2d 854 (5th Cir.1982), and cases cited therein.

### Probable Success on Appeal

Corneal has raised three (3) issues on appeal:

(1) Whether the Bankruptcy Court erred in finding that the Sky Plan satisfied § 1129(a) of the Code.

(2) Whether the Bankruptcy Court erred in finding that the Corneal Plan did not satisfy § 1129(a) of the Code.

(3) Whether the Bankruptcy Court erred in determining the claim of Mr. and Mrs. J. ("Jack") Holden Kieffer to be $0.00.

Initially we note that the determination regarding the Kieffers' claim was the result of live testimony, upon which the Court judged credibility and made findings

of fact. In order for the appellate court to reverse, it would be required to find this Court's ruling was clearly erroneous; same does not appear probable under these facts and circumstances.

Well prior to the plan confirmation hearing it became abundantly clear to all parties that the Kieffers' claim would pose varied problems for the competing plans. The Kieffers' claim arose from a leveraged buyout by Sky and Corneal, of the Kieffers' interest in the Debtor. Sky and Corneal assumed the primary obligation for the debt; the Debtor became a guarantor of the debt should Sky and Corneal default thereon. Corneal has in fact defaulted; Sky, however, has paid the debt on a current basis. The value of the Kieffers' claim against the Debtor became the most pivotal determination in the confirmation process, primarily because both Plans required such different results.

### A. Corneal Plan

Under Corneal's Plan of Reorganization, substantially all classes of claims are impaired. Therefore, in order for Corneal's Plan to be confirmed, the Court must agree to a "cramdown". Section 1129(a)(10) requires that at least one impaired class of claims vote in favor of a plan before a cramdown can be ordered. *In re Ruti–Sweetwater, Inc.,* 836 F.2d 1263 (10th Cir. 1988). None of Corneal's impaired classes was likely to vote for his Plan. The Kieffers were Corneal's friends and would vote for his Plan; this was his only hope. Corneal created an impaired classification for the Kieffers' claim by delaying its scheduled payment thirty (30) days longer than other claimants similarly situated. The Kieffers would then cast an impaired "yes" vote, and cramdown would be possible.

### B. Sky Plan

Sky knew that the Kieffers and Corneal were friends and that the Kieffers would vote against Sky's Plan. If the Kieffers' claim was impaired and they voted "no", Sky could only achieve a cramdown by paying their claim in full on the plan's effective date, or paying its present value

over time. 11 U.S.C. § 1129(b)(2)(B). Sky had one other alternative—to value the Kieffers' claim so that it was unimpaired. If the claim were unimpaired its vote would be presumed to be "yes". *Matter of Madison Hotel Associates*, 749 F.2d 410 (7th Cir.1984); 11 U.S.C. § 1126(f). In the instant case, the only way Sky could make the Kieffers unimpaired would be to "zero out" their claim. Specifically, Sky would be required to show that the Kieffers' claim, as against the estate, had no value and therefore no impairment. To reach that conclusion, it would be necessary for Sky to prove that the underlying debt was actually the obligation of Sky and Corneal, that the Debtor was only the guarantor, and that Sky was not only current, but also had the intention and financial ability to remain so.

Mr. Kieffer was present in the courtroom during substantially all of the testimony and argument offered regarding the Plan Confirmation process. This Court was cognizant of a long and animated dialogue between Corneal and Kieffer which took place near the courtroom door during counsels' arguments before the Court. Thereafter the Court noticed that Corneal returned to his chair, but Kieffer had removed himself from the courtroom. The time for valuation soon commenced; Kieffer was said to be ill with a malady similar to laryngitis and unable to participate in the valuation of his claim for the sole purpose of determining eligibility to vote. This Court determined that the hearing would go forward.

Testimony was taken indicating to the Court that Sky and Corneal individually owed the Kieffers a sum approximating $400,000.00. Corneal had defaulted upon this obligation; however Sky had kept his obligation, as well as Corneal's, in a current status. As the debt was current and as Sky had the ability and the inclination to keep it current, this Court found as a fact that the Kieffers' contingent claim against the Debtor, as guarantor of Corneal and Sky, was valued at $0.00 for the purpose of eligibility to vote. Shortly after this decision was rendered, Kieffer made a miraculous recovery: he was able to reenter the courtroom and was prepared to testify, although allegedly still very frail of voice. The Court reopened the testimony and permitted Kieffer to stand by the court reporter so that a record could be made without causing him further discomfort. Within a few sentences a miracle worthy of Lourdes occurred: Kieffer regained full use of his voice and was able to complete his testimony from the witness chair across the room.

Based upon this additional testimony, coupled with the testimony previously received, we again concluded Sky and Corneal were the primary obligors on the Kieffers' debt and that Debtor was solely a guarantor. Although Corneal had defaulted on his obligation, we found Sky to be an obligor of substantial financial stability, who had maintained the debt service to the Kieffers in a fully current status. Having no reason to find that Sky would be unable or unwilling to continue the required debt service, this Court valued the Kieffers' claim at $0.00.

Counsel further questions this Court's determination that the liquidation value of the Debtor was $7.5 million. The scenario surrounding that decision is also worthy of comment in this case. Corneal and Sky each presented the Court with testimony from real estate appraisers. Corneal's expert did not prepare a liquidation assessment of the estate; Sky's expert did conduct a liquidation analysis, arriving at a valuation of $7.5 million. This Court found said valuation persuasive and adopted same. *After* the testimony was concluded and this Court made said finding, Corneal produced a prospective purchaser named Douglas Jemal ("Jemal"), who allegedly was willing to buy the hotel for $10 million in cash, with no contingencies. Corneal asserts that said offer proves a liquidation value of $10 million. Unfortunately, we have never received any testimony indicating Jemal's financial stability and/or ability to consummate such an offer. This Court did not and would not foreclose such testimony—however, counsel, deeming his testimony unnecessary, chose not to make a record on this issue.

While the property may or may not be for sale, this Court cannot base a property valuation on a purchase offer with so little substantiation. Making an offer to purchase for $10 million and being financially capable of doing so are not necessarily one and the same. Although Jemal was produced at the District Court hearing on March 6, 1989, he did not appear or testify on March 17, 1989 before this Court. We were provided only with Jemal's Statement of Financial Condition, to which all other parties actively objected, in our Court and the District Court. The financial statement is that of Douglas and Joyce Jemal, indicating property held jointly. Having no indication that the purchase offer was also jointly made, the financial strength of the offer, and therefore its validity for valuation purposes, is substantially dashed. Said statement does nothing to affect our valuation. It is unaudited and is merely a compilation of information provided by the Jemals, which has been neatly packaged for easier reading. We believe the valuation as found on January 25, 1989 was and is valid.

Turning to the feasibility of the competing Plans we find some factors to be of paramount importance. It appears that Corneal has created a procedural issue where one need not exist. This Court ordered that evidence of feasibility must be hand-delivered for review prior to January 25, 1989, the date of confirmation. Sky mailed same to Corneal; Corneal asserts that the method of delivery reduced the time his counsel had to so review. He also asserts that various documents were not included as they should have been. We note that Corneal's counsel has offices approximately ten (10) blocks from our Clerk's Office, and if so inclined, could have reviewed the papers here. We further note that the Court is the party charged with determining feasibility. The information is of greatest import to the Court. Corneal was not seriously harmed by this procedural oversight.

Additionally, the Sky Plan was supported by substantial financial strength and provided the Court with clear and substantial indication of its ability to be consummated.

The secured creditors had agreed to assumption of their respective debts and sufficient funds were in place, through letters of credit, to pay the unsecured creditors in full at the time of Plan confirmation. In contradistinction, Corneal's Plan was based upon illusory promises of financing by a party who withdrew the necessary backing. Without said backing, the likelihood of Plan consummation was substantially diminished.

Furthermore, an appellate court would recognize that the overwhelming majority of creditors in every class voted "for" the Sky Plan and "against" the Corneal Plan, after having considerable opportunity to compare and contrast the two (2) options. These creditors are the parties with the money on the table. They have overwhelmingly accepted the Sky Plan and rejected the Corneal Plan in equal degree. Neither this Court nor any appellate court should contradict the voice of the majority, absent extraordinary circumstances, which are not present in this case.

Having so stated, it appears unlikely that Corneal will succeed on the merits.

### Irreparable Harm To Corneal

It appears to this Court that Corneal will in fact be harmed if the stay is denied: Sky's Plan will be substantially consummated and Corneal's appeal will be moot. However, even if Corneal were successful in having this Court's decision reversed, Corneal will likely be harmed. Reversal would return the parties to their respective positions. It would *not* work to automatically approve Corneal's Plan. A new vote would be required. Corneal might succeed on the vote; he probably would not. In either event, time will pass from the appeal process through a new Plan confirmation. At least one full season of profitability at the hotel will have been lost and the property will remain in its present state of "restoration".

The property has already been deeded to the purchaser under the Sky Plan. UNB's mortgage has been assumed pending the purchaser's refinancing. A deed in lieu of

foreclosure has been executed. If the purchaser does not maintain the debt service and find substitute financing by September 30, 1989, UNB will act on the deed, and there will be nothing for Corneal to reorganize.

If the case were to be converted to a liquidation, months or years from now, we may or may not have valid liquidation purchasers. Sky may or may not be financially able to purchase the facility; Corneal's claims may or may not be paid.

### Possible Harm To Other Parties

The harm to Corneal must be measured against the harm to other parties. The primary party to be hurt by this stay would be the Debtor itself. Debtor is a hotel facility in need of substantial repair and restoration before it can be opened for the spring and summer seasons. If the repairs are waylaid as a result of the stay and appellate process, the hotel will not be able to operate during this crucial season. The Trustee does not have the financial wherewithal to maintain the status quo for an extended period of time. Without such cash flow the Debtor will be forced to liquidate.

Sky will also be substantially harmed. He has invested significant sums to fund the Trustee's maintenance and has incurred expenses in post-confirmation activities. If Sky is stayed, his activities will cease, including the maintenance support to the Trustee. Without the interim cash input from Sky this house of cards will fall and liquidation of necessity must follow.

Liquidation will result in all proceeds going to the secured creditors. Even so, the secured creditors will likely recover less than they are owed. No other creditors will receive any return on their claims whatsoever. This is compared to a fully funded plan of reorganization, providing 100% distribution to *all* creditors.

Last but certainly not least, the community of Bedford will be deprived of a landmark resort, a healthy tax base, and substantial employment opportunities for the members of its community.

### Public Interest

Congress intended to encourage the rejuvenation of once-thriving businesses through Chapter 11 proceedings. If a stay is granted in this case, liquidation will be imminent, whether by conversion to Chapter 7 or by a Chapter 11 Liquidation Plan. It is certainly more in the public interest to reorganize a business than to subject same to foreclosure and cannibalization by creditors.

The Court finds that the examination of the above elements weighs against the granting of a stay; therefore, said motion will be denied.

An appropriate Order will be issued.